**UNITED STATES of America,**

v.

**VELSICOL CHEMICAL CORPORATION, a corporation, formerly Michigan Chemical Corporation, Charles L. Touzeau, and William Thorne, Defendants.**

**Crim. No. 79–492.**

United States District Court, District of Columbia.

Sept. 30, 1980.

F. William Soisson, Ross Parker, Asst. U.S. Attys., Eastern District of Michigan, Detroit, Mich., for United States.

Vincent J. Fuller, Barry S. Simon, Williams & Connolly, Washington, D. C., for defendant Velsicol Chemical Corp.

William E. McDaniels, Williams & Connolly, Washington, D. C., for defendant Charles L. Touzeau.

Gregory B. Craig, Williams & Connolly, Washington, D. C., for defendant William W. Thorne.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

The indictment against the several defendants in this criminal proceeding was originally returned in the federal court for the Eastern District of Michigan in April 1979. Immediately thereafter various pretrial motions were filed presenting defenses and objections based on alleged defects in the institution of the prosecution and the indictment. At a later stage the proceeding was transferred to this Court upon a determination of possible prejudice and pretrial publicity preventing the defendants from obtaining a fair and impartial trial in the Eastern District of Michigan. Rule 21(a), Fed.R.Crim.P. The defendants' several pretrial motions seek dismissal of the indictment and raise issues of prosecutorial vindictiveness, prejudicial preindictment delay, prosecutorial abuse of the grand jury, multiple prosecutions and prejudice arising from the totality of circumstances preceding and including the return of the indictment.

Of the five motions, one is particularly troublesome. It concerns the role and conduct of the prosecutor in the course of this proceeding and the return of the indictment. The issue is whether the defendants were victims of prosecutorial vindictiveness. Simply presented the question is—may the government prosecutor threaten a defendant with the prospect of increased charges calculated to deter him from exercising his right to offer a *nolo contendere* plea under Rule 11(b), Fed.R.Crim.P.? And later, after the defendant has exercised that right and the plea is accepted, may the prosecutor then pursue and indict the defendant with additional and more serious charges which antedate the initial charging decision? The basic elements of the new charges were known to the prosecutor, or at least known to and shared by responsible government personnel intimately involved in the prosecution efforts, at the time of the initial charging decision, at the time the defendant tendered the *nolo* plea, and at the time the government prosecutor challenged that right.

A hearing on the various motions, particularly the prosecutorial vindictiveness issue, consumed several days. Extensive testimony was presented by the parties. After determining the credible testimony and reviewing the documentary evidence the Court enters its findings and concludes that

the present indictment arises out of and is flawed by prosecutorial misconduct and as a consequence should be dismissed.

## I.

### Factual Findings

In April 1979 Velsicol Chemical Corporation (formerly Michigan Chemical Corporation) (Velsicol or Corporation) and two officials were indicted in the District Court for the Eastern District of Michigan for criminal violations of the United States Code. A two–count indictment charged the Corporation and two employees, Charles Touzeau and William Thorne with (1) concealing, falsifying and covering up material facts relating to the contamination and adulteration of food and drug products and making false, fraudulent statements and representations in matters within the jurisdiction of a federal agency, the Food and Drug Administration (FDA). 18 U.S.C. § 1001; and (2) conspiring among themselves and with others to defraud the FDA in the performance of its lawful functions. 18 U.S.C. § 371.

The indictment was concerned with an alleged "cover–up" by Velsicol and its employees of an incident of contamination of animal feed resulting from intermingling of polybrominated biphenyl (PBB), a flame retardant, with magnesium oxide (MgO), used as an animal feed supplement. In 1973 and 1974 the Corporation operated in St. Louis, Michigan a plant producing and supplying both chemicals. Farm Bureau Services, Inc. used magnesium oxide supplied by the Corporation as an animal feed additive. Farm Bureau is not included in the present indictment. Touzeau and Thorne served as plant manager and operational manager, respectively, in the defendants' Michigan facility. The material facts alleged to have been concealed and which form the overt acts in the conspiracy count concern the following: (1) the time when defendants obtained knowledge of the cattle feed contamination involving PBB; (2) the manufacture of PBB in granulated form known as "Firemaster, FF–1" which is similar in appearance to MgO; 3) the manufacture and storage of PBB in close proximity to MgO; and 4) the packaging of FF–1 in bags similar to those used to package MgO.

The government's attention was focused on the Corporation sometime prior to April 26, 1974. On that date an inspector from the FDA interviewed the individual defendants concerning PBB contamination of animal feed distributed by Farm Bureau Services. The government contends that at an earlier date the defendants were aware of the claim that PBB was possibly intermingled with MgO thereby leading to contamination of the animal feed. On that date and several times thereafter, FDA inspectors visited the Michigan plant and interviewed Touzeau and Thorne concerning the contamination problem, focusing on the manufacturing, packaging, storage and shipping of PBB and MgO as possible causes of cattle feed contamination. They are charged with covering up their knowledge of material facts and making certain false statements to the FDA inspectors on April 26 and 29, 1974.

In August 1974 the investigation had progressed to the point that the Detroit FDA office sought instruction from Washington for possible misdemeanor adulteration charges and authorization to proceed with a hearing under the Federal Food, Drug and Cosmetic Act (Act), § 305, 21 U.S.C. § 335.[1] Thereafter, in January 1975, the FDA advised the Corporation that it was a suspected violator of the Act. Certain individual employees, including Touzeau, were also targeted at that time. Several months later, in connection with the section 305 hearing, counsel for the Corporation and the individual employees submitted written arguments giving reasons why the FDA should not recommend to the Department of Justice that criminal prosecution be pursued.

---

1. Section 305 provides notice and an opportunity to present views either orally or in writing to any person against whom the institution of criminal proceedings is contemplated under the Act.

The government pursued the PBB criminal investigation with the section 305 hearing through the spring of 1975. At that time the hearing focused in part on allegations of inconsistent statements made by Touzeau and Thorne in 1974 to the FDA inspectors. D. Ex. 48 at 4. Specifically, the FDA hearing officer noted that explanations given by the two defendants "changed with each FDA visit" and that Touzeau and Thorne "did not inform the FDA inspectors of the existence of the 'FF–1' product." *Id.* The statements, questioned by the FDA in March 1975, are a major predicate for the two–count indictment presently before the Court.

At the time of the FDA criminal investigation, civil damage suits had also been initiated in the local courts of Michigan against Velsicol and Farm Bureau Services. In that litigation depositions of various employees, including Touzeau and Thorne, were taken 1975 and 1976. The trial of the first suit, *Tacoma v. Michigan Chemical Corp.*, (Cir. Ct. Wexford City, Mich., Oct. 26, 1978), got underway in 1977. Beginning in 1975, voluminous discovery was taken and continued throughout that case. Touzeau and Thorne were deposed prior to the *Tacoma* trial and they, along with other employees of the corporation, testified at the trial itself. During the *Tacoma* pretrial proceedings the Government had access to their depositions and indeed monitored their trial testimony along with that of other employees for the purpose of evaluating individual criminal culpability. Summaries of the employees' testimony were prepared by FDA agents throughout 1977 and were used by the FDA's investigatory team in the course of its duties. The summaries contained specific allegations by plaintiffs' counsel in *Tacoma* that the Corporation was covering up facts from the FDA and were reviewed by a number of FDA employees. While the *Tacoma* depositions and trial testimony are in large part the basis of the present indictment charges, the government's criminal investigators neglected to pursue the false statements at that time.

During the first five months of 1977, a federal grand jury in the Eastern District of Michigan considered the question of individual culpability for the adulteration of animal feed, focusing in part on the Corporation's storage practice. This is an integral part of the present indictment. Count I, ¶¶ 8(b)(i), (c)(i), (d) and 9(b). That grand jury proceeding was conducted by the United States Attorney for the Eastern District, the Consumer Affairs Section of the Department of Justice and the FDA. The grand jury considered documents that now appear on the government's exhibit list for trial of the present indictment and presumably support the false statement and cover–up charges. D.Ex. 61. Yet no false statements or cover–up allegations were investigated at that time.

Finally, in the fall of 1977, the U.S. Attorneys' Offices of the Eastern and Western Districts of Michigan, and the Consumer Affairs Section of the Department of Justice, made the decision to charge both Velsicol and Farm Bureau Services [2] in an information with four misdemeanor adulteration counts. The information was filed in the Western District on November 28, 1977 and the defendants were arraigned before U.S. Magistrate Stephen Karr. At the same time James Brady, U.S. Attorney for the Western District of Michigan, who was assigned the prosecution role, announced that he had formed a PBB Task Force to answer the troubling questions of a cover–up of the investigation which had been raised publicly in the PBB matter.

Immediately following the arraignment, counsel for the parties attempted to negotiate a set of stipulated proofs which possibly could form the basis of a trial of the misdemeanor information. Some weeks later at a status conference, Magistrate Karr indicated that he might be receptive to the idea of a *nolo contendere* plea from the defendants. At no time was the government receptive to such a plea and the Corporation had always indicated that a guilty plea to

---

2. Farm Bureau Services was only a named defendant in the original misdemeanor indictment but not in the later–filed indictment of April 1979.

any count of the information was unacceptable because of the resulting civil consequences and because it had what it considered to be meritorious defenses. Their negotiations never approached a plea bargaining stage. The Magistrate's suggestion to consider the possibility of a *nolo contendere* plea, while attractive to the Corporation, provoked a different reaction by the government and, as the defendants charge, triggered a course of conduct intended to intimidate and to deter them from acting on the suggestion. The record supports the defendants' claim and the Court finds that the government threatened that it would refuse to agree on a stipulated set of proofs for trial if the tendered *nolo* plea was accepted and that the only alternative would be a complete and detailed trial. The Court also finds that the government prosecutor and his staff confronted the defendants with the further threat of additional charges if they successfully tendered a *nolo contendere* plea using the possibility of similar misdemeanor adulteration charges as a further "lever." [3]

At an April 4, 1978, meeting between counsel, the government laid out the threat of additional charges to counsel for the defendants. U.S. Attorney Brady specifically stated that he was free to bring other charges if Velsicol was successful in such an effort. Citing government policy, he stated that as a prosecutor, he would not support a *nolo* plea. Shortly thereafter the U.S. Attorney's Office and the responsible FDA officials had also received further information from attorney Frederick Boncher, plaintiff's counsel in the *Tacoma* damage proceeding, about allegations of cover–up by Velsicol. Several months earlier, in February 1978, Boncher had prepared and provided Assistant U.S. Attorney Dillon with a brief on exemplary damages, which detailed extensively plaintiffs' allegations of cover–up by Velsicol. In March of the same year,

Boncher visited Mr. Robert Schaefer, an FDA attorney, and related his belief that, based upon testimony from the *Tacoma* trial, Velsicol had lied to the FDA. Schaefer relayed this information to Brady. Then, in April of 1978, Schaefer and Mr. Dennis Degan, an FDA compliance officer, accompanied two FDA officials to the *Tacoma* trial for their testimony. During a session with plaintiffs' counsel preparatory to such testimony, and during the trial itself, counsel presented Schaefer and Degan with evidence of the alleged Velsicol cover–up and fraudulent statements made to the FDA. The same trial transcripts reviewed in the spring of 1977 were again reviewed. On May 7, 1978, a report and findings on those transcripts was prepared. Inconsistencies were found between statements made to the FDA in 1974 and 1975 and statements made at the *Tacoma* trial. Degan prepared the report and the findings in response to what he had heard at the *Tacoma* proceeding.

It was not until early May 1978, when, knowing that Velsicol would tender a *nolo contendere* plea despite the intimidating threats of additional charges, that the government first developed the charges in the present indictment. The Degan report was prepared out of a sense of urgency caused by an imminent plea of *nolo contendere*. Later developments confirm that fact, as well as its significance. On May 8, 1978, the date of the scheduled plea, the government sought and obtained a continuance from Magistrate Karr in order to prepare its opposition to the *nolo contendere* plea. The proceeding was set for May 19, and in the ten day period the government prepared its opposition in a series of meetings and telephone conversations in which FDA officials, attorneys from Brady's office, the FBI, and a representative from the Consumer Affairs Section of the Department of Justice participated. On May 9,

**3.** Although Mr. Brady's apparent intention was to confront the defendants with the prospect of hundreds of additional misdemeanor charges, his actual words were not so specific and were subject to the interpretation that they also included charges other than misdemeanors.

None of the other participants in the meeting recalls the use of the words "similar" or "misdemeanor" although some participants do not dispute that those terms *might* have been used. *Compare* Craig, McIntyre and Davis stipulations *with* Brady affidavit.

1978, Degan and Schaefer met to discuss Degan's report. Brady held a meeting at his home on May 10, 1978 to discuss the same subject; representatives of all interested government entities attended.

At the *nolo* proceeding on May 19, 1978, Mr. Brady, with the approval of the Consumer Affairs Section of the Department of Justice and the knowledge of the FDA, accused the Corporation and its employees Touzeau and Thorne of the same false statements set out in the present 1979 indictment. Indeed, he tracked the charges contained in the present indictment and identified the 1977 *Tacoma* testimony and earlier depositions as his basis of proof.

After the Magistrate proceeding, Brady and a representative of the Consumer Affairs Section of the Department of Justice held a press conference in the courthouse. Brady stated that he was "angry and upset" with the Magistrate's decision; that he would never have filed the charges if he had known a no contest plea would be accepted. He leveled accusations against Velsicol and bemoaned the fact that he could not send a corporation to jail. He stated there would be further charges, and the press reported that the charges would involve individual as well as the corporate defendants. This was essentially corroborated by Brady and other witnesses at the motions hearing.

Events following May, 1978 reflect a strong causal nexus between the government's opposition to *nolo contendere* and the present two–count felony indictment. The record clearly shows that Brady's office, the Consumer's Affairs Section of Justice and the FDA played the dominant roles in the grand jury proceedings culminating in this indictment. The grand jury which returned the indictment was convened in the Eastern District of Michigan in November, 1978. The May 7, 1978 Degan memorandum originally prepared as part of the government's opposition to the *nolo contendere* plea was later refined and became a source of the grand jury investigation leading to the 1979 indictment and an initial and important prosecutorial memorandum.

Mr. Dillon, an assistant in Brady's office, was assigned as a special assistant to the Eastern District and participated along with the Consumers Affairs Section in any grand jury proceeding when Velsicol employees were witnesses. Mr. Brady was consulted for advice and guidance during this period. The government's presentation to the grand jury, the draft of the indictment, and the final day's testimony of Mr. Degan were all prepared during the two weeks preceding April 26, 1979 by Dillon. The haste resulted from a last minute concern by the United States Attorney in the Eastern District that the statute of limitations would run after April 26. This concern, resulted from a phone call from Brady about "recently discovered" case law raising a question as to the validity of waivers of the statute which had been filed by the defendants with the court for over one month. Accordingly, the grand jury was called into session on an emergency basis. The present indictment was returned on April 26, 1979.

In sum, the sequence of events leading to this prosecution follow this route. The present indictment, returned in April 1979, charges defendants with criminal conduct no later than 1976. As early as March 1975, during the section 305 hearing, the FDA questioned the truthfulness of the very statements made in 1974 which are now alleged to have been fraudulent. As a matter of fact,the last overt acts alleged in the indictment occurred during the final stage of that hearing. On notice of possible discrepancies in statements made by the defendants, the FDA monitored their depositions and testimony at the *Tacoma* civil trial in early 1977 and prepared summaries of that proceeding. Thereafter, in November 1977, the government filed only misdemeanor feed adulteration charges. In February 1978, the United States Attorney's Office obtained the *Tacoma* plaintiffs' brief on exemplary damages. That brief delineated specific charges of misrepresentation against defendants much of which appears in the present indictment. These same charges were related to the FDA in March 1978 and relayed by Schaefer to Brady at

that time. Although armed with this and other supporting documentation, the government nonetheless did not pursue a felony indictment and prosecution but was content with a misdemeanor information. Yet, in May 1978, when defendants tendered a *nolo* plea to the misdemeanor charges, Brady stated that he was prepared to prove, as part of his proof on the misdemeanor charges, the precise allegations contained in the present multi–count felony indictment. Only after Magistrate Karr accepted defendants' *nolo* plea did the government pursue and launch this prosecution.

## II.

### Legal Analysis and Conclusions

■ The defendants' motion to dismiss the indictment for prosecutorial vindictiveness presents troubling questions concerning the broad discretion generally granted to prosecutors in bringing indictments and the role of the judiciary in supervising the exercise of that discretion. The specific issue presented is whether the due process clause will countenance the use of that discretion to threaten a defendant with additional criminal liability to deter that defendant from exercising a right to plead *nolo contendere* as provided by the Federal Rules of Criminal Procedure. The record in this proceeding causes this Court to conclude that the new indictment against Velsicol and its employees, the basic elements of which were established and well known at the time of the initial charging decision, should be dismissed. Under the circumstances the decision to file the new charges must be considered retaliatory and a violation of due process of law.

The Supreme Court first addressed the problems of vindictiveness in *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23

L.Ed.2d 656 (1969). That decision was then followed and extended in *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). Those rulings and their progeny are the framework upon which the Court considers the issues here presented. *Pearce* dealt with the limits of judicial discretion; *Perry* was concerned with limits on prosecutorial discretion.

■ In *Pearce* the defendants were successful in their efforts to reverse earlier convictions. Following retrial and reconviction, however, harsher sentences were imposed by the trial courts. The Supreme Court considered but rejected the application of double jeopardy and equal protection guarantees to this practice. It then turned to the due process implications and held that in view of the vindictiveness exercised against a defendant who successfully overturned his first conviction, a harsher sentence could not be supported. The Court ruled that due process would not tolerate judicial vindictiveness or retaliation for pursuit of a statutory right. "[S]ince the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge." 395 U.S. at 725, 89 S.Ct. at 2080. The Court, however, did not strike down all such instances of increased sentencing. Rather, it adopted a commonsense approach to the application of what has come to be known as the vindictive sentencing doctrine. Whenever a more severe sentence is imposed after retrial, reasons for the decision must be set forth on the record by the trial judge showing an objective and identifiable basis for the action taken.[4]

**4.** The vindictiveness concept was considered and distinguished in two decisions immediately following *Pearce*. *Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1971) and *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973). In *Colton*, the Court held that the *Pearce* rationale did not invalidate a "two–tier" system allowing a trial *de novo* in a court of general jurisdiction, with the possibility of a greater punishment, following a misdemeanor conviction in an inferior court. The Court found nothing to show "that the hazard of being penalized for seeking a new trial, which underlay the holding of *Pearce*, also inheres in the [Kentucky] de novo trial arrangement." 407 U.S. at 116, 92 S.Ct. at 1960. In *Chaffin*, the Court refused to apply *Pearce* in a case where a jury, as opposed to a judge, im-

In *Perry* the Supreme Court extended the *Pearce* doctrine to the conduct of prosecutors and to situations where there was a "realistic likelihood" of prosecutorial vindictiveness. The defendant Perry, exercising his right to a trial de novo, noted an appeal from a misdemeanor conviction. Notice of the appeal served to annul the prior conviction. While the appeal was pending, the prosecutor obtained a new indictment charging Perry with a felony for the same criminal conduct covered by the earlier misdemeanor charge. Relying upon *Pearce*, the Supreme Court held that the prosecutor's action violated defendant's right to due process. By following an appeal with an increased charge, thereby "upping the ante," the government could "insure that only the most hardy defendants will brave the hazards of a de novo trial." 417 U.S. at 28, 94 S.Ct. at 2102. While there was no hard evidence of prosecutorial bad faith or malice toward Perry, the Supreme Court noted that *Pearce* was not based on proof of vindictiveness in fact. The *Perry* Court observed that the prosecutor "has a considerable stake in discouraging convicted misdemeanants from appealing," in order to conserve limited resources. The court held, however, that this interest should not be furthered by burdening a defendant's exercise of his statutory rights with the apprehension of prosecutorial retaliation. *Id.* at 27–28, 94 S.Ct. at 2102. The felony indictment was dismissed. Thus "[*Perry*] and *Pearce* each establish a prophylactic rule imposing limits upon prosecutorial discretion in seeking new indictments." *United States v. DeMarco*, 550 F.2d 1224, 1227 (9th Cir.), *cert. den.*, 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977).

Those two rulings are particularly relevant to this proceeding. Here, the defendant Velsicol sought to exercise a right conferred under the Federal Criminal Rules and plead *nolo contendere* to misdemeanor charges. Intent upon discouraging such an offer, the prosecutor used the threat of additional charges as a "lever." Initially, this threat was lodged at the April 4, 1978 meeting.[5] The prosecution claims that the threat was made during plea bargaining and therefore is exempt from the *Pearce/Perry* doctrine under the Supreme Court's holding in *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). However, the government's reliance upon that decision is misplaced.

*Bordenkircher* recognized and reaffirmed the important role in our judicial system played by plea bargaining.[6] Following his client's arraignment on a forgery indictment, defendant's counsel met with the state prosecutor who opined that if the defendant refused to plead guilty and "save the court the inconvenience and necessity of a trial," he would seek a new indictment charging an offense under a habitual offender statute which carried a mandatory life sentence. Fully apprised of his options, defendant refused to plead. The prosecutor then obtained a subsequent indictment. Later, the defendant was convicted and sentenced as a habitual offender. The Court held that there was no due process violation when the prosecutor followed through on a plea bargaining threat to reindict the defendant on more serious charges for refusing to plead to the original charge.

In sustaining the felony conviction the Supreme Court carefully limited its holding to the " 'give–and–take' of plea bargaining" where the element of punishment or retaliation proscribed in *Pearce* and *Perry* is not present "so long as the accused is free to accept or reject the prosecutor's offer." 434 U.S. at 363, 98 S.Ct. at 668. In defining the scope of the holding, the Court noted that the defendant was "fully informed of

---

posed a greater sentence following a retrial. The Court found the possibility of vindictiveness to be "*de minimis*" when a *new* jury imposed the sentence. 412 U.S. at 26, 93 S.Ct. at 1982.

**5.** This meeting is discussed *supra* at 1259.

**6.** "We have recently had occasion to observe: 'Whatever might be the situation in an ideal world the fact is that the guilty plea and the often concomitant plea bargain are important components of this country's original justice system. Properly administered, they can benefit all concerned.' ..." 434 U.S. at 357, 98 S.Ct. at 667 (citation omitted).

the true terms of the offer when he made his decision to plead not guilty." *Id.* at 360, 98 S.Ct. at 666.[7] Such is not the case here.

The prosecutor's effort to cloak his April 4 threat in the folds of *Bordenkircher* must be rejected. While the government attorneys hoped to deter defendant from offering a plea by threatening to "up the ante," the circumstances do not accord with the "give–and–take of plea bargaining" addressed in *Bordenkircher.* First, the defendants desired to enter a plea of *nolo* and to "save the court the inconvenience and necessity of a trial." *Bordenkircher,* 434 U.S. at 358, 98 S.Ct. at 665.[8] *Bordenkircher* carved an exception to the *Pearce/Perry* doctrine because of the important policy of judicial economy which justifies the plea bargaining process. The interest served by a *nolo* plea, limitation of civil liability, cannot be accorded the same stature as that served by judicial encouragement of guilty pleas. Furthermore, even if *Bordenkircher* is applied to *nolo* plea negotiations, the facts here belie the considerations present in that case. This proceeding does not involve a give–and–take situation. It is clear from the various accounts put forth by those present at the April 4 meeting, that the prosecutor made an unspecified threat of increased criminal liability.[9] The element of bargaining and an informed decision on the part of defendant which *Bordenkircher* addressed was absent. Velsicol had no means by which to weigh the potential liabilities of a decision to plead *nolo contendere.* Whichever version of the prosecutor's threat the Court chooses to accept, it is clear that the defendant was not "fully informed of the true terms of the offer." *Bordenkircher,* 434 U.S at 360, 98 S.Ct. at 666.[10] There was no definite offer which Velsicol could accept or reject.

Similarly, *United States v. Litton Systems, Inc.,* 573 F.2d 195 (4th Cir. 1978) offers small comfort to the government. In *Litton,* the government made a specific offer which the defendant chose to reject, and it knowingly suffered the consequences. 573 F.2d at 197–98. The "proposal" made to Velsicol, unlike those offered in *Bordenkircher* and *Litton,* was neither clear nor definite. There was no opportunity to engage in the "give–and–take" envisioned in *Bordenkircher.* Moreover, the prosecutor's repetition of the threat at the press conference following the May 19, 1978, *nolo* hearing before the Magistrate cannot in any manner be considered an act or position taken during the course of plea bargaining or settlement negotiations. *Cf. Litton,* 573 F.2d at 197 (specific proposals advanced at talks aimed at exploring "alternatives to criminal prosecution").

■ Clearly the institutional interest behind the new charges must be considered. The prosecutor's stake in this case is not immediately apparent. He may have been motivated by the view that *nolo* pleas tend "to breed contempt for federal law enforcement." [11] But the government is not free to up the ante every time a defendant exercises his right to offer a *nolo* plea. Rather, the *Perry* prosecutorial vindictiveness doctrine prohibits the prosecutor from acting out of an actual retaliatory motivation or acting in a manner which instills in defendant an "apprehension" of retaliatory motivation. *Perry,* 417 U.S. at 28, 94 S.Ct. at 2102.

### A.

### *Apprehension of Vindictiveness*

The vindictive prosecution doctrine reaches all prosecutions "that pose a realistic

---

7. *Accord* ABA Standards Relating to the Administration of Criminal Justice, Pleas of Guilty, Standard 14–31, Commentary (1979).

8. *See generally,* Alschuler, *The Prosecutor's Role in Plea Bargaining,* 36 U.Chi.L.Rev. 50 (1968).

9. *See* footnote 3, *supra,* and accompanying text.

10. *Cf.* ABA Standards Relating to the Administration of Criminal Justice, Pleas of Guilty Standard, 14–1.5 (1979).

11. Statement of former Attorney General Herbert Brownell quoted by the court in *United States v. Jones,* 119 F.Supp. 288, 289–290 (S.D. Cal.1954). This view was reaffirmed in Statement of former Attorney General Edward Levi, January 18, 1977, Department of Justice Manual for United States Attorneys.

likelihood of 'vindictiveness,' " *Perry,* 417 U.S. at 27, 94 S.Ct. at 2102, whether or not the prosecutor acted out of vindictiveness in fact. "[T]he evil to which *Pearce* is directed is the *apprehension* on the defendant's part of receiving a vindictively–imposed penalty for the assertion of rights." *United States v. Jamison,* 505 F.2d 407, 415 (D.C. Cir.1974). While an "appearance of vindictiveness" standard for judging prosecutorial decisions has been repudiated in a recent opinion of the Sixth Circuit over a persuasive and well written dissent,[12] a similar test remains the law of this circuit. In *Jamison,* defendants, indicted for second degree murder, were granted a mistrial because their attorney's opening statement demonstrated ineffective assistance of counsel. Thereafter, the government, making use of the same evidence originally presented, reindicted defendants for first degree murder. Our Circuit Court of Appeals held that "reindictment of defendants for first degree murder, absent any showing of justification for the increase in the degree of the crime initially charged, denied them due process of law." *Id.* at 413. The Court left open the possibility of an increased charge under certain well–defined and limited conditions. For example, "a charge increase might in some circumstances be justified by intervening events or by new evidence of which the government was *excusably unaware* at the time of the first indictment." *Id.,* at 417 (emphasis added).

The Ninth Circuit has also ruled in a number of situations that the apprehension or appearance of prosecutorial vindictiveness is sufficient to warrant a dismissal when a defendant is thwarted in the exercise of his rights. The "mere *appearance* of vindictiveness is enough to place the burden on the prosecution [to show a legitimate motive]." *United States v. Ruesga–Martinez,* 534 F.2d 1367, 1369 (9th Cir. 1976).[13] Later, in *United States v. Groves,* 571 F.2d 450 (9th Cir. 1978), that court, relying in part on *Jamison,* ruled that the government bore the "heavy burden of proving that any increase in the severity of the *alleged charges* was not motivated by a vindictive purpose." 571 F.2d at 453. *Groves* demonstrates that the *timing* of a subsequent indictment can render it suspect. The defendant Groves was indicted for possession of cocaine in January 1976. In exchange for his agreement to cooperate with an ongoing investigation into marijuana trafficking, the government agreed to drop the cocaine charge and refrain from indicting on a marijuana felony charge. At that time, he expressly limited the degree of his anticipated cooperation. Then, months later, Groves moved to dismiss the cocaine charge asserting rights under the Speedy Trial Act, 18 U.S.C. § 3161(b). One week later, the government indicted him on the marijuana charge claiming that he had not fully complied with his agreement. The court promptly dismissed the indictment, finding that the government knew the extent of defendant's cooperation in January and secured a different indictment only after defendant exercised his right to a speedy trial.

■ When, as in this case, the government chooses not to lodge charges for a period of time and then makes the decision to prosecute so close after a defendant

---

12. *United States v. Andrews,* 612 F.2d 235 (6th Cir. 1979) (Green, J., for the court, Merritt, J., concurring, Keith, J., dissenting) (Rehearing *en banc* June 4, 1980).

13. *United States v. Alvarado–Sandoval,* 557 F.2d 645 (9th Cir. 1977) ("appearance of vindictiveness, not vindictiveness itself, is the touchstone ..."); *United States v. DeMarco,* 550 F.2d 1224, 1227 (9th Cir. 1977) ("apprehension of vindictiveness and the 'appearance of vindictiveness' are adequate to bring this case squarely within *Blackledge* [*v. Perry*].") (citation omitted).

The circuit courts of appeal have developed a number of standards for examining prosecutorial decisionmaking for impermissible motives. See discussion and cases cited in *United States v. Andrews,* 612 F.2d 235, 249–254 (6th Cir. 1979) (Keith, J. dissenting). Actual vindictiveness, however, is always regarded as an impermissible factor in prosecutorial decisionmaking. *See e. g., Hardwick v. Doolittle,* 558 F.2d 292, 299–300 (5th Cir. 1977), *cert. denied,* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978).

elects to exercise his rights in the face of prosecution opposition, apparent vindictiveness is clearly established. Indeed, the question of the delay and the timing of the present indictment is crucial.

The present Velsicol indictment alleges criminal conduct completed by 1976. All of the elements of the offenses charged were in existence both in November 1977, when the government brought the misdemeanor charges and in May 1978, when the Corporation pled *nolo* to those charges. At the time of that plea the government attorney stated that he was prepared to prove the cover–up, the specific elements of the crime which underlie this indictment. The basis of proof and evidence were materials in the government's possession since February 1978, at the latest. It is a fact, found in the transcript of the proceedings before magistrate Karr, that the prosecutor also stated that he had evidence of false statements made to the FDA, and he specifically mentioned the individual defendants Touzeau and Thorne.

On the basis of these facts the Court finds that defendants have made a strong *prima facie* showing of prosecutorial vindictiveness, or "apparent vindictiveness," based on the delay prior to the return of this indictment. Under *Jamison*, the government must dispel the apprehension raised by the apparent vindictiveness by expressly "negat[ing] the possibility of vindictiveness." 505 F.2d at 412. The government has failed to meet its burden. Nor can the *Jamison* exception, which allows a subsequent prosecution when the government is "excusably unaware" of new evidence supporting the subsequent charges, be invoked in this proceeding. The prosecution had the necessary information to seek an indictment by the grand jury long before April 1979. Indeed, it had sufficient information in its possession to support a state-ment by the prosecutor that he was prepared to prove the present charges on May 19, 1978. Any unawareness is inexcusable. The Court cannot overlook the allegations lodged in the *Tacoma* plaintiffs' brief on exemplary damages which the Assistant U.S. Attorney obtained in February 1978. Nor can Brady's failure to follow through on the charges related to him by Schaefer in March 1978 be overlooked. The Court must conclude that the government had the necessary evidence several months before filing new charges, but it chose to purse the charges only when Velsicol pled *nolo* to the misdemeanor information.

### B.

### Actual Vindictiveness

The government has been unable to provide even a seemingly "neutral explanation to demonstrate that it did not, in fact, act vindictively." *United States v. Andrews*, 612 F.2d at 252, (Keith, J., dissenting). In fact, the evidence strongly indicates a retaliatory motive. It is clear that Velsicol was threatened with increased charges in retaliation for a *nolo* plea. The fact that the subsequent indictment charges as co–defendants individual employees along with the Corporation is irrelevant. As noted above, the government had an institutional stake in discouraging *nolo* pleas. In opposing the plea, the prosecutor clearly stated that the misdemeanor charges were brought in an effort to attach "criminal responsibility to the persons, individuals, or corporations that caused this terrible problem the citizens of Michigan ... faced." Ex. 5 at 30. Fearful that the citizens of the state of Michigan would not understand acceptance of such a plea and that it might possibly "breed contempt for federal law enforcement," he sought out individuals upon which to attach criminal liability.[14]

14. See note 11, *supra*.

The fact that this indictment was returned in the Eastern District of Michigan under the authority of U.S. Attorney Robinson is irrelevant. First, Assistant U.S. Attorney Dillon, from Brady's office, partially conducted the grand jury proceedings in the Eastern District. Further, the indictment was sought on April 26, 1979 because of *Brady's* concern over the validity of the waivers. Brady and Robinson issued a press release *jointly* announcing the return of the indictment. In sum, it is clear that the activities of Brady were thoroughly enmeshed in the return of this indictment rendering it as much a product of his actions as those of anyone else.

The U.S. attorney clearly expressed his intent and motivation at the Magistrate hearing on May 19, 1978 when the *nolo* plea was accepted.

■ Thus, in addition to mere appearances, this proceeding involves an explicit threat, the gravamen of which is an intent to retaliate for the exercise of a right. That threat was carried out in the felony indictment presently before the Court. The limits of acceptable exercise of prosecutorial discretion in charging decisions are exceeded when, as in this case, the prosecutor threatens defendant with increased charges and then "ups–the–ante" without adequate justification. As the district court in *United States v. DeMarco* so aptly stated, "[t]he day our Constitution permits prosecutors to deter defendants from exercising any and all of their guaranteed rights by threatening them with new charges fortunately has not yet arrived." 401 F.Supp. 505, 510 (C.D.Cal.1975), *aff'd* 550 F.2d 1224 (9th Cir.), *cert. denied*, 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977). The prosecutorial vindictiveness motion warrants a dismissal of the present indictment against Velsicol and the individual defendants.

### III.

### *Other Defense Motions*

In light of the dismissal of this proceeding on grounds of prosecutorial vindictiveness it is not necessary to consider the remaining motions, although each presents, more or less, similar issues. One motion, however, the motion to dismiss because of grand jury abuse, warrants discussion and comment.

This indictment was returned in the Eastern District. The indictment reflected, in large measure, the combined efforts of the United States Attorneys' Office of both the Eastern and Western Districts of Michigan. The grand jury had been in session for over six months when the United States Attorney called an emergency session for presentation of the indictment. Dennis Degan of the FDA testified and was a principal grand jury witness. Government counsel attempted to defend the hastily called session by raising problems with the statute of limitations. However, the Court does not find the dicta cited by the prosecutors as compelling as they apparently did, when they urged immediate rejection of waivers filed with the court the previous month. *See Benes v. United States*, 276 F.2d 99, 108–09 (6th Cir. 1960). More important than the applicability of the case law, however, is the sudden discovery of the 1960 decision almost one month after execution of the waivers. Such laxity would not be tolerated in the conduct of a trial and should not be condoned here.

"Historically, [the grand jury] has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused …." *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). When, as in this case, the prosecutor calls the grand jury into session hastily and presents an indictment with the sword of the statute of limitations hanging overhead, the prosecutor should be able to offer some justification. While the Court offers no ruling upon this and the other motions, this pall over the conduct of the prosecuting attorneys lends further support to defendants' contention of vindictiveness.

Another aspect of the grand jury proceedings warrants comment. From the record and the testimony it is difficult, if not impossible, to assess the effect of the prosecutors' actions on the independence of the grand jurors' deliberations. The Court had the opportunity to review *in camera* the grand jury testimony. Only the testimony of the witnesses who appeared was transcribed. Comments and statements of the government attorneys before the grand jurors were not reported. This practice is suspect and susceptible of serious abuse. The ABA Standards Relating to the Prosecution Function suggest that the "prosecutor's

communications and presentations to the grand jury should be on the record." Standard 3–3.5(c). While these standards are not mandatory, the proposed practice would serve to alleviate some concern over the power of a prosecutor to undermine the function of this historic institution.

Similarly, while the Court does not find that this indictment is barred as a multiple prosecution, the motivation of the prosecutor merits scrutiny. "The question is whether this case involved an attempt 'to wear the accused out by a multitude of cases with accumulated trials.'" *Hoag v. New Jersey*, 356 U.S. 464, 467, 78 S.Ct. 829, 832, 2 L.Ed.2d 913 (1958) (quoting *Palko v. Connecticut*, 302 U.S. 319, 329, 58 S.Ct. 149, 153, 82 L.Ed. 288 (1937)). Brady was aware defendants would not plead guilty to the misdemeanor charges. When, through court acceptance of its *nolo* plea, defendant Velsicol avoided a trial, Brady decided to subject the corporation and individuals to new charges and more litigation. Such conduct does not give rise to the bar of double jeopardy on these facts but lends further support to defendants' claim of prosecutorial vindictiveness. The present indictment charges a cover–up of the incident originally contained in the misdemeanor information. Thus, subsequent prosecution may be justified. However, as noted above, the timing and conduct of the instant prosecution is the determining factor in its dismissal.

Defendants' motion to dismiss because of pre–indictment delay rests upon a view of the facts which is inconsistent with the Court's findings on the vindictiveness motion. Defendants claim that the government delayed the prosecution of this indictment to gain tactical advantage. Defendants' Memorandum in Support of Motion to Dismiss Indictment for Pre–Indictment Delay at 6. To the contrary the Court finds that the present indictment was hastily formulated and brought in retaliation for Velsicol's offer of a *nolo* plea. Accordingly, if at all prejudicial to defendants, it was because the delay afforded the prosecutor a lever against Velsicol's desire to plead *nolo*. Defendants have not shown that the "pre–

indictment delay in this case caused substantial prejudice to [defendants'] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971).