Allen ATCHAK, Appellant,

v.

STATE of Alaska, Appellee.

No. 4435.

Court of Appeals of Alaska.

Aug. 27, 1981.

Jeffrey M. Feldman and James D. Gilmore, Gilmore & Feldman, Anchorage, for appellant.

Peter Gruenstein and David Mannheimer, Asst. Attys. Gen., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C. J., and COATS and SINGLETON, JJ.

BRYNER, Chief Judge.

On October 7, 1978, Allen Mike Atchak was convicted of five counts of leaving the scene of an accident involving injury without stopping to render aid (hereinafter failure to render aid).[1] After sentencing, Atchak brought this appeal, in which he contends, first, that the trial court erred in instructing the jury and in regulating final argument and, second, that his conviction must be reversed because of prosecutorial vindictiveness.

## JURY INSTRUCTIONS AND FINAL ARGUMENT

At about 1:30 a. m. on September 21, 1977, Atchak was driving an older model Chrysler north on C Street in Anchorage. He had consumed about five to eight beers that night. Near C Street and Fireweed Lane, Atchak attempted to go around the right side of a Toyota camper which was in the center lane, also northbound. Atchak's Chrysler was in the outer (right hand) lane as it went past the Toyota; it then steered into the center lane, but in so doing struck the Toyota's right front bumper. The Chrysler then passed over the center line, sideswiped an oncoming Chevrolet, and spun out of control back into the northbound lanes, eventually striking a guardrail and coming to a stop about 100 feet down C Street. Moments later, Atchak drove away, still northbound on C Street.

When Atchak's car hit the Toyota camper, the impact caused the Toyota to veer immediately across the center line of C Street, directly into the path of the oncoming Chevrolet. As Atchak's Chrysler sideswiped the Chevrolet, or shortly thereafter, the Toyota and Chevrolet collided head-on. One of the five occupants of the Toyota and Chevrolet was killed; the other four were injured.

Several weeks before Atchak's case came to trial, the Alaska Supreme Court rendered its decision in *Kimoktoak v. State*, 584 P.2d 25 (Alaska 1978). In *Kimoktoak*, the court considered the constitutionality of AS 28.-35.060, which defines the offense of failure to render aid.[2] Though AS 28.35.060 did not expressly require *mens rea*—i.e., a finding that the defendant actually knew that injuries to other persons had occurred, the court avoided constitutional problems by construing AS 28.35.060 to require proof of knowledge as an element of the offense. *Id.* at 31. The court specifically held that the prosecution bore the burden of proving that the accused (1) knew that an accident had occurred and (2) either knew that injuries resulted or was actually aware "that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person." *Id.* at 32. The court rejected use of an objective "reasonable person" standard as a substitute for proof of subjective knowledge:

It is not the reasonable person who is on trial but the defendant and it is the defendant's knowledge which must be proved and not that of a hypothetical reasonable person.

*Id.* at 32.

The court further concluded in *Kimoktoak* that evidence of intoxication of the accused was admissible to the extent that it reflected on his personal awareness of actual injuries or circumstances which would

1. *See* AS 28.35.050 and 28.35.060.

2. AS 28.35.060 reads in part:
   (a) The operator of a vehicle involved in an accident resulting in injury to or death of a person or damage to a vehicle which is driven or attended by a person shall give his name, address, and vehicle license number to the person struck or injured, or the operator or occupant, or the person attending, and the vehicle collided with and shall render to any

person injured reasonable assistance, including making of arrangements for attendance upon the person by a physician and transportation, in a manner which will not cause further injury, to a hospital for medical treatment if it is apparent that treatment is desirable. Under no circumstances is the giving of assistance or other compliance with the provisions of this paragraph evidence of the liability of an operator for the accident.

reasonably lead to a conclusion that injury had occurred. *Id.* at 34.

At Atchak's trial, evidence was presented relating to his consumption of alcohol, and Atchak testified that he was completely unaware of any of the three separate collisions: his collision with the Toyota, his side-swiping of the oncoming Chevrolet, or the head-on collision between the Toyota and the Chevrolet. Atchak stated that he could remember only spinning out of control and hitting the guardrail. Given the nature of Atchak's defense, it is apparent that *Kimoktoak's* ruling had direct bearing on Atchak's trial.

At the conclusion of testimony, Atchak proposed an instruction defining the elements of failure to render aid which he contended accurately incorporated *Kimoktoak's* holding regarding the element of knowledge.[3] The court elected instead to give three separate instructions on the elements of failure to render aid. Its first instruction set forth the elements of the offense as stated by the language of AS 28.35.060. This instruction was silent as to the element of knowledge. The other two instructions, however, closely paralleled the

language of *Kimoktoak* dealing with the element of knowledge.

On appeal, Atchak asserts that the court's instructions were inadequate and that error was committed in rejecting his proposed instruction. This argument, however, ignores the fact that the court in *Kimoktoak* expressly approved a specific jury instruction which dealt with knowledge as an element of the offense and the jury's ability to consider intoxication in deciding the extent of the defendant's knowledge. *Kimoktoak v. State*, 584 P.2d at 34 n.7.[4] The trial court's instructions on the element of knowledge are consistent with the instruction approved in *Kimoktoak*, and, in fact, the court's second instruction on knowledge was adopted virtually verbatim from the approved instruction. Since the court's first instruction on the elements of the offense of failure to render aid adequately apprised the jury of all necessary elements with the exception of the element of knowledge, and since the two additional instructions specifically addressing the element of knowledge conformed precisely to the requirements of *Kimoktoak*, we conclude that no error was committed by the court in instructing the jury.[5] There was

3. Atchak's proposed instruction read, in part:
   [B]efore you may find the defendant guilty of the offense charged, you must be convinced beyond a reasonable doubt of either of the following: that at the time the defendant left the scene of the accident he had actual knowledge, personally, that injuries to persons had resulted or that at the time he left the scene of the accident he had actual knowledge and was personally aware of the fact that the accident was of such a nature as to have necessarily resulted in injuries to persons.
   . . . .
   Although intoxication is not a defense to the crime with which the defendant is charged, his state of intoxication is relevant to your consideration of his state of mind at the time of the incident. To the extent that you believe that his level of intoxication may have prevented Mr. Atchak from knowing either of the injuries which may have resulted from the accident or knowing of the nature of the accident itself, you may consider such evidence of intoxication in evaluating that element of the offense.

4. The approved instruction reads:

   In the crime of [failure to render assistance] of which the defendant is accused [in Count . . . of the information], a necessary element is the existence in the mind of defendant of knowledge that [injury has occurred or knowledge that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person].
   If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant has such knowledge.
   If from all the evidence you have a reasonable doubt whether defendant had such knowledge by reason of a state of intoxication, you must give the defendant the benefit of that doubt and find that he did not have such knowledge.

5. While it would have been preferable to set out all of the elements of failure to render aid in a single instruction, the trial court's first instruction on the elements of the offense, which covered all elements except knowledge, in no way implied that the elements set out therein were the only elements of the crime. Accordingly, no potential for confusing the jury

no abuse of discretion by the court in rejecting the alternative instruction proposed by Atchak.

■ Atchak next argues that the court committed error by permitting the prosecutor, in the course of final argument, to rely upon the objective "reasonable person" standard specifically rejected by the court in *Kimoktoak*. This argument is without merit. The prosecution at no time argued that the reasonable person standard could be substituted for actual knowledge by Atchak that injuries had occurred or that the nature of the accident was such that injury could reasonably be expected to have occurred. In fact, the prosecutor fully acknowledged in his argument that the state bore the burden of proving Atchak's subjective knowledge. The state's reference to the reasonable person standard was a brief one, confined to the issue whether a reasonable person would have anticipated the occurrence of injuries given the actual knowledge which it contended Atchak must have possessed according to the evidence presented at trial.

Atchak argues, however, that *Kimoktoak* established a totally subjective test, precluding any reference whatsoever to the reasonable person standard. We believe this view to be a misreading of the court's holding in *Kimoktoak*. As the court specifically observed:

> The standard we have enunciated does speak in terms of reasonableness in that the evidence must at least show that the accused knew that the accident was of the sort that one would 'reasonably anticipate' would cause personal injury.

*Kimoktoak v. State*, 584 P.2d at 32. By holding the element of knowledge to be satisfied by proof of knowledge of actual injury or knowledge of circumstances "of the sort that one would 'reasonably antici-

pate' would cause personal injury," the court indicated that once the jury has determined the extent of the accused's subjective knowledge of the circumstances surrounding the accident in question, it is then entitled to apply an objective standard in determining whether he left the scene with the requisite knowledge. We find nothing in this conclusion to be inconsistent with *Kimoktoak's* general rejection of the reasonable person standard as a substitute for proof of subjective knowledge under AS 28.35.060.[6] Under this standard, the jury must still ultimately base its verdict on the actual knowledge of the accused; the question whether a reasonable person would anticipate the existence of personal injury is in effect circumstantial evidence of the accused's knowledge.

Atchak's counsel was, moreover, given considerable latitude to argue to the jury his own concept of the appropriate standard for determining the essential element of knowledge. He was permitted to read to the jury the specific instruction which they would be given, and, in so doing, he skillfully placed his own gloss on it. There was no reference whatsoever to the reasonable person standard by the state in rebuttal to the defendant's final argument.

We therefore find no error in the manner in which the state was permitted to argue the element of knowledge to the jury.

■ Atchak's second contention with respect to final argument is that the court improperly restricted his counsel from a specific line of argument. Prior to commencement of final argument, Atchak's counsel asked the court to permit him to argue that, in order to convict, the jury would have to find that Atchak actually knew of the head-on collision between the Toyota and the Chevrolet.[7] After consider-

---

was created by treating the elements of the crime in three separate instructions.

**6.** We believe that differences in phrasing such as "should the *defendant* reasonably have anticipated injury" (Atchak's preference) in light of what he knew, "should *one* reasonably have anticipated injury," "should *a person* reasonably have anticipated injury," or "should *a rea-*

*sonable person* have anticipated injury," amount to verbal distinctions without any difference in substance. As aptly stated by the prosecution in the course of arguing this issue below: "They all mean the same thing."

**7.** Atchak's counsel stated:

able discussion the trial judge precluded the requested argument.

We find no error in this decision. There was ample evidence presented at trial to support a factual finding by the jury that Atchak could reasonably have anticipated that injury would occur even if he was unaware of the head-on collision. There was, thus, utterly no basis upon which counsel could properly have told the jury that this possibility was foreclosed from their consideration.[8] We conclude that Atchak's final argument was not unduly restricted by the court.

## PROSECUTORIAL VINDICTIVENESS

Atchak also claims that his convictions must be reversed due to prosecutorial vindictiveness. This is a difficult issue of first impression in Alaska.

Atchak was originally indicted on September 29, 1977. He was charged with four counts of failure to render aid, each count relating to one of the four persons injured in the accident of September 21, 1977. In another count, Atchak was charged with negligent homicide[9] based upon the fatal injuries sustained by the fifth victim of the September 21 collision.

Atchak moved to dismiss the four counts of the indictment charging him with failure to render aid; his grounds were identical to those which were subsequently ruled upon in *Kimoktoak v. State*, 584 P.2d 25 (Alaska 1978)—namely, that AS 28.35.060 was, on its face, an impermissible strict liability crime, since it failed to require proof of knowledge as an element of the offense.

> [M]y position is that he [Atchak] had to know about that accident that caused the injury, which is the Chevy/Toyota and I think that's what *Kimoktoak* says.

8. We do not construe defense counsel's request as one to make the limited factual argument that, under the evidence presented, Atchak could not reasonably have anticipated injury unless he was aware of the head-on collision. Counsel's statement "I think that's what *Kimoktoak* says," coupled with his repeated statement that he wished to argue that the jury "had to find" that Atchak was aware of the head-on collision convinces us that Atchak's attorney wanted to argue that the jury was

Atchak contended that the indictment was obtained on the theory that the statute did not require proof of knowledge, and that the grand jury was told that it could indict on the basis of a reasonable person standard. Atchak's motion was denied on October 31, 1977.

Thereafter, Atchak's trial was repeatedly delayed for various reasons not germane to this appeal. In early April of 1978, the state dismissed Atchak's manslaughter charge and one of the counts of failure to render aid. No reason was given on record for the dismissal. On September 1, 1978, the supreme court issued its decision in *Kimoktoak v. State*. At the time, Atchak's trial was scheduled to begin on September 25.

On the afternoon of Wednesday, September 20, 1978, Atchak's counsel, Mr. Gilmore, informed the trial prosecutor, Mr. Merriner, that Atchak contemplated renewing his motion to dismiss the three remaining counts of failure to render aid in light of the recent *Kimoktoak* ruling. The following morning, Thursday, September 21, Mr. Gilmore filed a motion for renewed consideration of his previous challenge to Atchak's indictment; he informed Mr. Merriner that he had filed the motion. Argument on the renewed motion was apparently fixed for the afternoon of September 21. At that time, Mr. Gilmore appeared, but, instead of arguing the motion, he withdrew it, stating:

> [I]n my conversation with Mr. Merriner this morning after I filed the motion and also yesterday afternoon I think when I first advised him that I would be or possi-

precluded as a matter of law from convicting the defendant unless it found that he was aware of the head-on collision. Even assuming that Atchak's counsel meant to indicate only that he wanted to make a factual argument, the manner in which his request was made was sufficiently ambiguous to warrant its rejection by the court as potentially misleading.

9. *See* former AS 11.15.080. Negligent homicide under this statute was punishable under former AS 11.15.040 by imprisonment not to exceed twenty years. AS 28.35.060 provides for a maximum period of imprisonment of ten years for the offense of failure to render aid.

bly might be filing it, he indicated to me that it would be the district attorney's intention to seek a reindictment not only on the three counts that are left in the case but that also an indictment would again be sought on the manslaughter charge. . . . Because of that threat and that possibility, after my conference with Mr. Atchak this afternoon, it's our position that we will have to withdraw the motion to reconsider the earlier . . . ruling of the court . . . because we cannot face the exposure of having a resurrection of that manslaughter count.

Mr. Merriner thereupon stated that he wished to make his position clear for the record. He admitted mentioning reindictment on the higher charge in the event that Atchak pursued his challenge to the indictment. He maintained, though, that he had spoken of resurrecting the manslaughter charge only in terms of a possibility, and not as a certainty. Mr. Merriner explained that the Atchak case had originally been assigned to him, but was reassigned to another prosecutor, who decided "he didn't want to try the manslaughter and dismissed it;" later, the case was assigned back to Mr. Merriner. In any event, Mr. Merriner stated that he had gone on vacation and returned to his office to find the *Kimoktoak* case on his desk. According to Mr. Merriner, he believed that, in light of *Kimoktoak*, manslaughter might be an easier charge to prove than failure to render aid.

Mr. Merriner also informed the court that he was considering reindicting Atchak on the following day. In response to a question by the court, he stated that it was "quite likely" that he would not seek to reindict on the next day if he believed that Atchak had entered a valid waiver of his right to renew his challenge to the initial indictment—in other words a waiver which Atchak could not claim to have been coerced by the statement about reindictment for manslaughter.

Mr. Gilmore's decision to withdraw Atchak's motion for reconsideration remained unchanged in the face of Mr. Merriner's explanation.

On the next day, Friday, September 22, Atchak was reindicted and charged with five counts of failure to render aid, one count relating to each person involved in the head-on collision of September 21, 1977, including the victim who had been fatally injured. At the time set for Atchak's trial to begin, September 25, Mr. Merriner professed to be ready for trial, but told the judge that a new indictment had issued upon which Atchak had not yet been arraigned. He then indicated that the original indictment was still pending and that he did not intend to dismiss it, stating that his decision on how to proceed would depend "upon the motions by Mr. Gilmore."

After some additional discussion, the defendant was arraigned on the new indictment. Mr. Gilmore reiterated his view of the circumstances leading to withdrawal of his renewed motion, reaffirming his belief that the withdrawal had been coerced. He then stated that he had spoken with Mr. Merriner over the weekend and that, again, "the ghost of [the] manslaughter charge" had arisen in the conversation and that Mr. Merriner had "strongly implied to me, if not expressly stated" that if the trial were delayed by defense motions, reindictment for manslaughter would follow. Accordingly, Mr. Gilmore stated that, although he believed, after hastily reviewing a recording of the grand jury proceedings which led to the new indictment, that the new indictment was defective and subject to challenge, he felt constrained from moving against the new indictment by the same threat which had forced withdrawal of the renewed motion to dismiss the original indictment.

A lengthy discussion ensued, dominated by Mr. Merriner's explanation of the state's position. Mr. Merriner candidly acknowledged deciding not to reindict for manslaughter because he had concluded that it would be to the state's advantage to proceed to trial without delay. Mr. Merriner specifically stated his willingness to "forego the manslaughter to get this on to trial," but expressly asserted his intent to consider reindicting for manslaughter in the event

the defense precipitated a delay. Mr. Merriner expressly recognized that he had adopted a position which in effect forced Atchak to choose between abandoning his right to challenge the new indictment and asserting that right at the risk of facing the enhanced charge of manslaughter. It was Mr. Merriner's view that a state was within its rights to impose such a choice upon the defendant; he analogized the choice to a plea bargaining situation.[10] In a colloquy with the court, Mr. Merriner argued that

the court could not properly preclude the state from considering increasing its indictment to charge manslaughter in the event of a successful challenge to the indictment by Atchak.[11]

Atchak alleges that the circumstances summarized above give rise to an impermissible appearance of prosecutorial vindictiveness in violation of his right to due process under the United States and Alaska constitutions.[12]

10. In likening this situation to a plea bargain, Mr. Merriner did not assert that the situation actually amounted to plea bargaining, and, in fact, he specifically acknowledged that plea bargaining was not involved.

11. Because of the relevance of Mr. Merriner's remarks to the critical issue of appearance of prosecutorial vindictiveness, we set forth below a limited portion of the transcript of the September 25 proceedings:

THE COURT: Just to get it out on the table, if a continuance is granted ... will then his client be subject to...

MR. MERRINER: Manslaughter?

THE COURT: ...a manslaughter charge...

MR. MERRINER: Well, I...

THE COURT: ...following because of those sequence of events?

MR. MERRINER: I personally have not looked since I decided not to go manslaughter. I personally have not looked at the 4 month requirement, I had an intern do it.... I'd have to look in terms of when the FBI people will be willing to [come] back.... I'd have to talk personally to the mother [of the deceased victim], I haven't even spoken to her at all in this case .... She has talked with Mr. Balfe [the District Attorney] in months past but not recently .... I thought it better not even to—from what I heard in terms of her emotional state—call her and ask her about this choice. I guess she was quite upset when the manslaughter was dismissed originally but that's sort of died down and Mr. Balfe believes her desire is now just to get it over with, that's best for her emotional health. So there are all kinds of things I'd have to consider but it would be a possibility and Mr. Gilmore knows that ....

THE COURT: But it seems to me like you've still got the bayonet in his back.

MR. MERRINER: Well, I do, yes, and I've analyzed it in my mind and...

THE COURT: That's what concerns me.

MR. MERRINER: ...I feel that I'm in a better position with getting the new indictment than I was before on that grizzly choice matter, in that they might have decided that well, that wasn't an effective waiver and

therefore we'll look at the first indictment and the supreme court might've decided that was a bad indictment. Now, we've got 2 indictments, surely one of them's good.

. . . .

THE COURT: Well, you're shifting the responsibility to me.

MR. MERRINER: No, I...

THE COURT: If you've got a cause of action for manslaughter and negligent homicide you should bring it...

MR. MERRINER: Well, except...

THE COURT: ...if the crime was committed. Then I think that's your duty to prosecute on that. Might very well be your responsibility to prosecute for that offense. But it puts the trial court in—almost in an unattainable [sic—untenable] position for me to summarily tell Mr. Gilmore and his client the bayonet's in your back but it's going to stay there and you're going to have to go...

MR. MERRINER: Well, it's a bayonet that the state always has in any plea negotiation situation, for example, the court doesn't get involved, the state says plead to hit and run or you get manslaughter, you go to trial and the U. S. Supreme Court and our court has said that's perfectly legitimate, we've got to rule on plea negotiation. Of course, Your Honor knows our policy from the attorney general on that, thus we haven't maimed [sic—made] that particular offer. In this situation it just happens that a choice has arisen but I mean that's—I'm not afraid of that choice anymore under the record we've got. I think if he waives today he's waived and it's just a choice as any defendant makes in any plea negotiation situation, not even as difficult a one. My golly, in that kind of a situation he's told definitely you'll go to trial on manslaughter unless you plead to hit and run and all I'm saying is you might have a manslaughter indictment come down against you, which probably will be bad under rule 45, unless you go to trial today. I'm not even asking for any kind of a plea.

12. U.S.Const. amend. XIV; Alaska Const. art. 1, § 7.

In *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), the United States Supreme Court considered whether a person convicted upon retrial after his initial conviction was set aside on appeal could properly be given a sentence greater than the sentence received upon his initial conviction. The court concluded that an increased sentence upon reconviction would run afoul of constitutional due process requirements unless the increase was justified by an on-the-record statement by the sentencing court providing "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." 395 U.S. at 726, 89 S.Ct. at 2081, 23 L.Ed.2d at 670.

The holding of the court in *Pearce* was not restricted to actual vindictiveness but extended to the potential chilling effect on the exercise of appellate rights created by the appearance of vindictiveness stemming from enhancement of a sentence upon retrial:

> Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process requires also that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing court.

395 U.S. at 725, 89 S.Ct. at 2080, 23 L.Ed.2d at 669 (footnote omitted).

The rule of *Pearce* was extended to vindictive conduct on the part of prosecutors five years later in *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). There, petitioners were convicted of misdemeanors after state district court trials in North Carolina. They then asserted their right to trial de novo in superior court, which was provided for by law without a showing of error upon the filing of a notice of appeal. Felony charges were thereupon substituted by the prosecution, and petitioners were convicted of these charges.

After discussing *Pearce* and two subsequent cases dealing with the issue of judicial vindictiveness—*Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), and *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) —the court in *Blackledge* found:

> The lesson that emerges from *Pearce, Colten*, and *Chaffin* is that the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of 'vindictiveness.'

417 U.S. at 27, 94 S.Ct. at 2102, 40 L.Ed.2d at 634.

Finding the prosecutors had a clear and considerable "stake" in discouraging automatic retrials and, further, that means were available for them to discourage the exercise of these appellate rights by "upping the ante" through use of felony indictments, 417 U.S. at 27–28, 94 S.Ct. at 2102, 40 L.Ed.2d at 634, *Blackledge* concluded that these cases invoked the same policies addressed by *Pearce*. Consequently, the court found it appropriate to extend *Pearce* to prosecutorial vindictiveness. In so holding, *Blackledge* reaffirmed the emphasis which *Pearce* gave to the conclusion that both actual and apparent vindictiveness are equally deleterious in their effects:

> There is, of course, no evidence that the prosecution in this case acted in bad faith or maliciously in seeking a felony indictment against Perry. The rationale for our judgment in the *Pearce* case, however, was not grounded upon the proposition that actual retaliatory motivation must inevitably exist. Rather, we emphasized that 'since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.' We think it clear that the same considerations apply here.

417 U.S. at 28, 94 S.Ct. at 2102, 40 L.Ed.2d at 634 (citation omitted). It was, therefore, the "potential for vindictiveness" as much as actual vindictiveness itself which was the subject of scrutiny by the court in *Blackledge*. 417 U.S. at 28, 94 S.Ct. at 2103, 40 L.Ed.2d at 635.

The Alaska Supreme Court, construing article 1, section 7 of the Alaska Constitution has accorded predominate significance to the right of the accused to be free from the chilling effects of the appearance of judicial vindictiveness. Thus, in *Shagloak v. State*, 597 P.2d 142 (Alaska 1979), the court went beyond *Pearce* in holding that the due process clause of the Alaska Constitution prohibits an increase in sentence upon retrial under any circumstances.

The prosecutorial vindictiveness rule of *Pearce* and *Blackledge* has generated a myriad of decisions in recent years, primarily in federal courts.[13] There has been little inclination to apply the *Pearce/Blackledge* doctrine restrictively; recent cases have extended the doctrine to apparent instances of prosecutorial retaliation against the assertion by defendants of a broad spectrum of pre-appeal rights.[14]

While there are significant differences in the terms used by various courts to articulate the standard for a finding of prosecutorial vindictiveness, there is at least widespread recognition of the basic principles involved in the *Pearce/Blackledge* doctrine:

> The rule that emerges from the Supreme Court's decisions in *Pearce* and *Blackledge* is that the due process clause prohibits the state from retaliating against a defendant's exercise of constitutional or statutory rights. Because the mere appearance of vindictiveness may deter a defendant from challenging the lawfulness of his conviction, due process concepts prohibit the state from 'upping the ante.' The rule applies whenever the prosecution has knowledge of the facts essential to the more serious charge at the time of the original indictment. The good faith or bad faith of the prosecutor is irrelevant and it is not necessary for the defendant to show actual vindictiveness. Absent an adequate justification for the superseding or additional charges, vindictiveness will be presumed.[15]

The existence of prosecutorial vindictiveness must be established by an objective standard,[16] on the basis of the totality of the circumstances in each case.[17] The subjective belief of the defendant is not determinative; on the other hand, it is not necessary that actual malice or retaliatory motivation exist on the part of the prosecution.[18]

---

**13.** Discussion of these cases is unnecessary here. For a recent and helpful review of the numerous federal cases dealing with the issue of prosecutorial vindictiveness, *see* Smaltz, *Due Process Limitations on Prosecutorial Discretion In Re-charging Defendants: Pearce to Blackledge to Bordenkircher*, 36 Wash. & Lee L.Rev. 347 (1979).

**14.** *See, e.g., United States v. Andrews*, 633 F.2d 449 (6th Cir. 1980) (en banc), *cert. denied sub nom. United States v. Brooks*, 450 U.S. 927, 101 S.Ct. 1382, 67 L.Ed.2d 358 (1981) (motion for admission to bail); *Miracle v. Estelle*, 592 F.2d 1269 (5th Cir. 1979) (motion for a new trial); *United States v. Groves*, 571 F.2d 450 (9th Cir. 1978) (motion to dismiss for violation of speedy trial); *United States v. Alvarado-Sandoval*, 557 F.2d 645 (9th Cir. 1977) (search and seizure motion); *United States v. DeMarco*, 550 F.2d 1224 (9th Cir. 1977) *cert. denied*, 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1978) (motion for change of venue); *United States v. Johnson*, 537 F.2d 1170 (4th Cir. 1976) (motion to withdraw plea); *United States v. Ruesga-Martinez*,

534 F.2d 1367 (9th Cir. 1976) (refusal to waive right to trial before federal district judge); *United States v. Jamison*, 505 F.2d 407 (D.C. Cir.1974) (motion for mistrial); *United States v. Velsicol Chemical Corp.*, 498 F.Supp. 1255 (D.C.D.C.1980) (assertion of right to plead *nolo contendere*); *State v. Stevens*, 97 N.M. ——, 635 P.2d 308 (Ct.App.1981) (motion to dismiss indictment).

**15.** Smaltz, *supra* at 353 (footnote omitted).

**16.** *See, e.g., United States v. Andrews*, 633 F.2d at 454.

**17.** *See, e.g., United States v. Griffin*, 617 F.2d 1342, 1347 (9th Cir. 1980).

**18.** *See, e.g., United States v. Andrews*, 633 F.2d at 455; *Miracle v. Estelle*, 592 F.2d at 1273; *Lovett v. Butterworth*, 610 F.2d 1002, 1006–7 & n.11 (1st Cir. 1979), *cert. denied*, 447 U.S. 935, 100 S.Ct. 3038, 65 L.Ed.2d 1130 (1980); *Jackson v. Walker*, 585 F.2d 139, 143–45 (5th Cir.

■ Virtually all courts recognize that the prosecution must be given the opportunity to rebut a claim of prosecutorial vindictiveness.[19] Again, however, adequacy of the explanation offered by the prosecution is judged by an objective standard. It is insufficient for the prosecution merely to establish the lack of actual malice; instead, a *prima facie* showing of vindictiveness must be rebutted by "negating the possibility of vindictiveness." *United States v. Velsicol Chemical Corp.*, 498 F.Supp. at 1265. Thus, the Court of Appeals for the Sixth Circuit, sitting en banc, has recently held:

> We emphasize that once a court has found the existence of a realistic likelihood of vindictiveness the burden of disproving it is on the government. . . . [W]e do not think that judges should pass on subjective good faith assertions by prosecutors. Both *Pearce* and *Blackledge* went out of their way to avoid such difficult and unpleasant decision-making. At the same time, in *Blackledge* the court noted in a footnote that '[t]his would clearly be a different case if the state had shown that it was impossible to proceed on the more serious charge at the outset.' From this, we think that only objective, on-the-record explanations can suffice to rebut a finding of realistic likelihood of vindictiveness.

*United States v. Andrews*, 633 F.2d at 456 (footnote and citation omitted).[20]

In this case, the state makes a number of concessions. It acknowledges that Atchak's right to challenge the indictment against him falls within the coverage of the *Pearce/Blackledge* doctrine. It also concedes that the state's assertion of the potential of a manslaughter charge is sufficient to meet the requirement that the state "up the ante." Finally, the state recognizes that Atchak has presented a *prima facie* case of prosecutorial vindictiveness.[21]

The state relies exclusively on the argument that it has sufficiently rebutted the appearance of vindictiveness, arguing that *Kimoktoak v. State* changed the standard of proof for failure to render aid, thus creating an intervening circumstance which justified reevaluation by the state of its charges.

■ We must first determine the strength of the appearance of vindictiveness in this case. This is a process which involves, first, an inquiry as to the prosecu-

---

1978); *United States v. DeMarco*, 550 F.2d at 1224; *United States v. Velsicol Chemical Corp.*, 498 F.Supp. at 1263–65.

**19.** Even in the fifth circuit, where cases speak in terms of a *"per se"* rule of prosecutorial vindictiveness in cases where the prosecution substitutes an increased charge based upon the same criminal conduct (*see, e.g., Jackson v. Walker*, 585 F.2d at 143), it appears that the explanation offered by the prosecution for any increase in charges is a factor in deciding whether the appearance of vindictiveness exists. *See, e.g., Miracle v. Estelle*, 592 F.2d at 1277.

**20.** A similar conclusion is reached by Smaltz, *supra* at 348:

> Only where an event occurs between the first and second indictments, which on its face negates the appearance of retaliation, will a charge increase be condoned. After-the-fact rationalizations are insufficient to justify the additional charges when the government's action smacks of vindictiveness. It is the very *appearance* of vindictiveness, not simply express retaliation, which the courts proscribe.

(Emphasis in original; footnote omitted). *See also United States v. Jamison*, 505 F.2d at 417 ("[A] charge increase might in some circumstances be justified by intervening events or by new evidence of which the government was excusably unaware at the time of the first indictment.")

**21.** The state has not argued and therefore implicitly concedes that Mr. Merriner's conduct does not fall within the plea bargaining exception to the *Pearce/Blackledge* doctrine. *See Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). Recent cases and the language of *Bordenkircher* itself plainly support restricting the plea bargaining exception to cases involving mutual negotiations for entry of a plea. *See, e.g., United States v. Andrews*, 633 F.2d at 456–57; *United States v. Velsicol Chemical Corp.*, 498 F.Supp. at 1262–63. *See also United States v. Ruesga-Martinez*, 534 F.2d at 1370. We conclude that, under the present circumstances, the plea bargaining exception to the *Pearce/Blackledge* doctrine does not apply.

tion's "stake" in deterring exercise of the specific right asserted by the defendant, and, second, scrutiny of the state's conduct for a connection between assertion of a right by the accused and an increase or threatened increase in charges by the state. *United States v. Andrews*, 633 F.2d at 454. This case had been postponed on numerous occasions; further postponement was to the disadvantage of the state. The problem of rescheduling numerous witnesses, among them experts from the FBI laboratory in Washington, D. C., was obviously one of considerable importance to the prosecution. Furthermore, the state's dismissal in April, 1978, of the manslaughter charge against Atchak had left at least one primary witness, a relative of the deceased victim, quite upset, precipitating complaints to the district attorney. The prospect of delay was so troublesome that Mr. Merriner purposely avoided mentioning the possibility to relatives of the deceased victim. On this record, we must conclude that the state's stake in avoiding the delay which would inevitably flow from a successful challenge by Atchak to his indictment was clear and considerable.

We turn next to the specific conduct of the prosecution. In considering this question courts have deemed the chronology of events to be of primary significance. "Without [a] close temporal—or otherwise apparent—link between the exercise of the right and the 'penalty,' there can be no 'realistic likelihood of vindictiveness.'" *United States v. Thurnhuber*, 572 F.2d 1307, 1310 (9th Cir. 1977).[22] Here, Atchak's original manslaughter charge was dismissed at the beginning of April, 1978. Despite strong objection to the dismissal by relatives of the deceased victim, the district attorney's office took no action to reinstate the charge. Mr. Merriner admitted that he was well aware of the potential for and actually anticipated the decision which was ultimately rendered in *Kimoktoak*. Despite this knowledge, he took no steps to reinstate the manslaughter charge after being assigned to the case. The first mention of

resurrecting the manslaughter charge was made by Mr. Merriner to Mr. Gilmore in direct response to Mr. Gilmore's statement that he intended to renew Atchak's motion to dismiss. Mr. Merriner's statement contained no reference to reevaluation by the state of its charges in light of *Kimoktoak*. Rather, he bluntly stated that he would consider reindicting on manslaughter if Atchak pursued his motion.

There are other indications in the record that no serious thought had been given to reindictment until the state was informed that Atchak would renew his motion. It was only on September 21, the morning after Mr. Merriner was first contacted by Mr. Gilmore, that hasty efforts were first made by a law clerk working for Mr. Merriner to determine whether speedy trial problems might preclude reindictment for manslaughter. Although stating that his concern was that the *Kimoktoak* decision had rendered proof of failure to render aid unduly difficult, Mr. Merriner repeatedly intimated in the course of the proceedings of September 21 and 25 that there was no serious possibility of reinstatement of the manslaughter charge if the case went to trial as scheduled. Though the state could have reindicted for manslaughter on September 22, Mr. Merriner chose not to, for the admitted purpose of assuring that trial would proceed as scheduled. Although, through the exercise of due diligence, Mr. Merriner could have determined whether speedy trial problems or other difficulties would preclude him from seeking manslaughter charges, he made no good faith effort to do so, thus assuring that, on September 25, the state was still in a position to assert the potential for a manslaughter charge as a possibility. When pressed for an explanation why no firm decision had been made with respect to reindictment for manslaughter, Mr. Merriner, on September 25, indicated that he felt under no obligation to make up his mind about the charge for the sake of the court or the defendant.

Finally, Mr. Merriner's own perceptions of what he was doing are telling. He can-

---

**22.** *See also United States v. Griffin*, 617 F.2d at 1347; *United States v. Groves*, 571 F.2d at 453.

didly admitted creating a situation in which the defendant was forced to choose between a possible manslaughter charge and waiver of his right to challenge the indictments against him, comparing his conduct to plea bargaining.

Viewing the totality of these circumstances, we find strong circumstantial evidence that the prospect of an increased charge of manslaughter might have been asserted to induce Atchak to refrain from delaying the trial by challenging the indictments against him.

We next consider whether the explanation offered on the record fulfills the state's obligation of "negating the possibility of vindictiveness." *United States v. Velsicol Chemical Corp.*, 498 F.Supp. at 1265. We must determine whether an objective view of the totality of the circumstances, including the state's explanation, results in the conclusion that an appearance of vindictiveness persists.[23]

As previously mentioned, the state, in rebuttal, urges that the supreme court's ruling in *Kimoktoak v. State* substantially changed Alaska's law with respect to the standard of proof for the offense of failure to render aid, and that, since the state's decisions to rely on the charge of failure to render aid were made on the basis of reasonable reliance upon prior law, *Kimoktoak* constituted an intervening event which entitled it to consider indicting anew on the previously dismissed manslaughter charge.

Of primary concern, then, is the question of reliance by the state on pre-*Kimoktoak* law in formulating its charges. This question has two facets. The first issue is whether *Kimoktoak* altered preexisting law upon which the state could reasonably have

relied. A second and separate consideration is whether the state actually did rely on pre-*Kimoktoak* law in deciding what charges to pursue against Atchak. If there was no basis for reasonable reliance on a theory of law inconsistent with *Kimoktoak*, or if the state did not in fact rely upon such a theory in making its decision to proceed against Atchak solely on charges of failure to render aid, then the state cannot be justified in claiming entitlement to reevaluate its position in light of *Kimoktoak*.

*Kimoktoak's* primary holding was that, although the language of AS 28.35.060 had no requirement of a mental element, the statute was not a strict liability crime; the court ruled that the essential element of *mens rea*, in this context knowledge of the accident, could be inferred. It would be untenable for the state to contend that it could reasonably have believed, prior to *Kimoktoak*, that AS 28.35.060 would be held valid without a finding that it implicitly required proof of knowledge as an element. Well in advance of *Kimoktoak*, the law was clear that strict liability or mere negligence could not be tolerated under due process as a basis for conviction of a serious criminal offense. *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *Speidel v. State*, 460 P.2d 77 (Alaska 1969). Indeed, we take judicial notice of the fact that the position of the state in the *Kimoktoak* appeal was that AS 28.35.060 should be construed as containing an implied requirement of knowledge as an element of the offense.

The state further asserts, however, that *Kimoktoak* was an intervening change in the law in that it declared failure to render aid to be a specific intent crime, thus

---

**23.** Some courts have avoided the phrase "appearance of vindictiveness" and have favored terminology such as "apprehension of vindictiveness" and "realistic likelihood of vindictiveness." *Compare United States v. Andrews*, 633 F.2d at 457, *with United States v. Griffin*, 617 F.2d at 1347, *and United States v. Jamison*, 505 F.2d at 413.

We believe that the particular terminology used to describe the applicable standard for determining prosecutorial vindictiveness is not of critical importance. The various standards

articulated, if properly applied, lead to the same conclusion. Accurate application of an objective standard of reasonableness in determining existence of an appearance of vindictiveness will assure that the doctrine of prosecutorial vindictiveness is applied only in circumstances where there is a reasonable and realistic potential for a chilling effect on the assertion of rights by the accused and others similarly situated. This we believe to be the crux of the *Pearce/Blackledge* rule.

changing the standard of proof for the offense. The state has misread the *Kimoktoak* case. The court in *Kimoktoak* did not construe AS 28.35.060 to be a specific intent crime; in fact it specifically noted that the offense fell into the category of general intent crimes.[24] *Kimoktoak* held only that evidence of intoxication was relevant and admissible on the issue of the defendant's actual knowledge of the circumstances surrounding an accident. There was no prior case law in Alaska to the contrary, and, as a reading of *Kimoktoak* shows, California had specifically construed a similar statute to allow evidence of intoxication. The state in its brief in *Kimoktoak* specifically cited the pertinent California case law so holding, but urged the supreme court to adopt a contrary position, relying on judicial decisions from two other states.

▮ Under these circumstances it is difficult to conclude that *Kimoktoak* altered preexisting law or "changed the standard of proof" in Alaska with respect to the offense of failure to render aid. The state's decision to drop the original charge of manslaughter and to proceed to trial against Atchak exclusively on charges of failure to render aid may have been the product of mistake or negligence; at best, the state took a calculated risk that its arguments in *Kimoktoak* would be accepted. Such a decision does not amount to reasonable reliance on established law; nor can *Kimoktoak* properly be considered an intervening change in law justifying reevaluation by the state of its earlier decisions on how to proceed against Atchak.[25]

**24.** The court stated in *Kimoktoak*, 584 P.2d at 33:

> We agree with the state that failing to render assistance under AS 28.35.060 is not a specific intent crime but one which merely requires general criminal intent.

**25.** It is well settled that prosecutorial mistake, negligence or misunderstanding will not suffice to rebut a *prima facie* showing of prosecutorial vindictiveness. *See United States v. Andrews*, 633 F.2d at 456; *Lovett v. Butterworth*, 610 F.2d at 1006; *United States v. Alvarado-Sandoval*, 557 F.2d at 646; *United States v. Ruesga-Martinez*, 534 F.2d at 1370; *State v. Stevens*, 97 N.M. ——, 635 P.2d 308 (Ct.App.1981).

▮ Even if *Kimoktoak* could be construed as an intervening change of law, the record in this case gives no indication that the state actually and excusably relied on preexisting law in making its decision to proceed against Atchak exclusively on charges of failure to render aid. Although the charges of failure to render aid contained in the original indictment against Atchak were apparently based on the objective reasonable person standard of knowledge rejected in *Kimoktoak*, when these charges were first challenged by Atchak in October, 1977, Mr. Merriner, who was at that time handling the case, specifically acknowledged that the state would in fact be bound at trial to a theory of actual knowledge. Moreover, Mr. Merriner's remarks of September 21, 1978, go even further in showing a lack of reliance on pre-*Kimoktoak* law:

> [T]he case [*Kimoktoak*] concerns me in terms of the present hit-and-run charges against the defendant because there can be an argument that the man was so drunk that he didn't know he was in an accident and you have to prove actual subjective knowledge under *Kimoktoak* which—*it wasn't that clear before Kimoktoak. We thought maybe that would be the case, but it wasn't that clear* . . . .

(Emphasis added.) These remarks show that the prosecution was aware of the likelihood that it would be required to adhere to a subjective standard of knowledge and that *Kimoktoak* only rendered certain that

Nor is it appropriate, where apparent vindictiveness would result, to allow the state to alter an initial charging decision which amounted to a calculated risk, rather than an exercise of prosecutorial discretion made for legitimate, strategic reasons:

> The lower courts have properly identified three situations which do not fall directly within the *Pearce/Blackledge* rule: reinstatement of original charges after withdrawal of a plea bargain, discovery of new evidence of additional crimes, and legitimate, strategic reasons for not charging separate offenses. However, these 'exceptions' must be construed narrowly if the *Pearce/Blackledge* rule is to retain its full vitality.

Smaltz, *supra* at 364.

which the state had suspected to be the case all along. Accordingly, we find no basis for the state's claim that it actually relied upon pre-*Kimoktoak* law in deciding to proceed against Atchak exclusively on charges of failure to render aid.

Even assuming the validity of the state's assertion that *Kimoktoak v. State* constituted an intervening circumstance justifying reevaluation of its charges, a significant problem persists. The *Pearce/Blackledge* rule clearly prohibits not only a retaliatory increase in charges which is calculated to deter a defendant's assertion of his rights but also the very threat of such an increase. *United States v. DeMarco*, 550 F.2d at 1227–28. As stated in *United States v. Velsicol Chemical Corp.*, 498 F.Supp. at 1266:

> [I]n addition to mere appearances, this proceeding involves an explicit threat, the gravamen of which is an intent to retaliate for the exercise of a right.... The limits of acceptable exercise of prosecutorial discretion in charging decisions are exceeded when, as in this case, the prosecutor threatens defendant with increased charges and then 'ups-the-ante' without adequate justification. As the district court in *United States v. DeMarco* so aptly stated, '[t]he day our constitution permits prosecutors to deter defendants from exercising any and all of their guaranteed rights by threatening them with new charges fortunately has not yet arrived.' 401 F.Supp. 505, 510 (C.D.Cal. 1975), *aff'd* 550 F.2d 1224 (9th Cir. 1976), *cert. denied*, 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977).

Here, as in *United States v. Velsicol Chemical Corp.*, a specific threat was made to increase charges against Atchak should he pursue his motion. Assuming the validity of the state's argument that *Kimoktoak* constituted an intervening change in law, the state was entitled to reevaluate its earlier dismissal of manslaughter charges against Atchak. But this fact could not entitle the state to use its authority to reconsider its charge as a club with which to pummel Atchak into submission. The state's perceived need to reevaluate its ear-

lier charging decision in light of *Kimoktoak* simply could not justify the communication to Atchak's counsel of a specific threat to increase charges *in the event the motion to dismiss was pursued.* Absolutely no explanation or justification is offered by the state for Mr. Merriner's remark, which was made in direct response to Mr. Gilmore's statement that Atchak's dismissal motion would be renewed. Once Mr. Merriner's comment was made, the cat was out of the bag, and the withdrawal of Atchak's motions became virtually inevitable.

We need not, on this record, attempt to determine whether Mr. Merriner's statement amounted to an act of actual vindictiveness. It is sufficient to observe that the appearance of vindictiveness generated by a statement such as the one which he made is a compelling one and is not capable of being lightly dispelled. The language of the court in *Lovett v. Butterworth*, 610 F.2d at 1006–07, is applicable here:

> Petitioner should not now be penalized for any error of the Commonwealth in its fashioning of the original charge. '[I]t is the apprehension that there may be retaliatory action, not the procedural state of facts, which implicates due process rights.... That the government failed to [bring the grand jury indictment] prior to defendant['s] assertion of the right to [trial de novo] because of ... [a] mistake ... does not alter the fact that the increased charge "appears vindictive."' *United States v. Andrews*, 444 F.Supp. [1238] at 1240, 1243. That the prosecutorial error was inadvertent 'is, of course, no acceptable excuse whatsoever.' *United States v. Ruesga-Martinez*, 534 F.2d at 1370.

A situation similar to the case at bar was considered in *United States v. Ruesga-Martinez*, 534 F.2d 1367 (9th Cir. 1976). There, the government substituted a felony indictment for misdemeanor charges when the defendant refused to agree to trial before a federal magistrate and insisted on his right to trial before a district judge. The government argued that it had originally

assumed that the defendant would waive his right to trial before the district court and that it had inherent discretion, akin to plea bargaining, to increase charges when its expectations did not pan out. The court in *Ruesga-Martinez* expressly disavowed the government's argument, and, finding no actual plea bargaining to have occurred, concluded that the defendant's due process rights had been violated under the *Pearce/Blackledge* doctrine.

■ We believe that the circumstances here are on a par with those of *Ruesga-Martinez.* While the state's perception of an overriding need to retain its trial date in the present case is, under the circumstances presented, fully understandable, the state was not entitled to secure its trial date by coercion. "The state has no valid interest in imposing unreasonable conditions on [the defendant's] legitimate exercise of his due process right." *Shagloak v. State,* 597 P.2d at 145.

While we realize that prosecutorial independence is a vital consideration involved in all cases dealing with the *Pearce/Blackledge* rule, our solicitude for the independent discretion of the state diminishes significantly when, in increasing or threatening to increase a charge, the prosecution simply attempts to alter, without significant intervening circumstances, a fully informed decision which it previously made. As held in *Hardwick v. Doolittle,* 558 F.2d 292, 301 (5th Cir. 1977), *cert. denied,* 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978) (citation omitted):

> We recognize that there is a broad ambit to prosecutorial discretion, most of which is not subject to judicial control.

But if *Blackledge* teaches any lesson, it is that a prosecutor's discretion to reindict a defendant is constrained by the due process clause. . . . [O]nce a prosecutor exercises his discretion to bring certain charges against the defendant, neither he nor his successor may, without explanation, increase the number of or severity of those charges in circumstances which suggest that the increase is retaliation for the defendant's assertion of statutory or constitutional rights.

In the present case, Atchak was originally charged with manslaughter, but this charge was later dismissed, and the dismissal was allowed to stand for a period well in excess of five months despite the fact that the state either actually knew or reasonably should have known of the potential for the ruling which was announced in the *Kimoktoak* case. Thus, in no sense did *Kimoktoak* create a need for "a new decision or act of discretion by the state attorney to initiate charges," and while the need for prosecutorial freedom in making an initial charging decision is a critical factor, here, "[c]onversely, its absence . . . appears to diminish the state's interest." *Miracle v. Estelle,* 592 F.2d at 1276.[26]

■ We are thus compelled to conclude that the state's actions in this case violated the due process standard established by *Pearce* and *Blackledge.* In so holding, we emphasize that our conclusion does not rest upon a determination that the state has acted maliciously or in bad faith, for under the *Pearce/Blackledge* rule, it is the objective appearance of a reasonable likelihood of vindictiveness, rather than actual malice or retaliatory motivation which controls.[27]

26. *Compare United States v. Griffin,* 617 F.2d at 1348 (holding unpredictability of a trial court decision applying a novel legal theory to be a relevant factor in determining the existence of an appearance of vindictiveness).

27. As stated in *United States v. Ruesga-Martinez,* 534 F.2d at 1369 (footnotes and citations omitted; emphasis in original):

> *Pearce* and *Blackledge* . . . establish, beyond doubt, that when the prosecution has occasion to reindict the accused because the accused has exercised some procedural right,

the prosecution bears a heavy burden of proving that any increase in the severity of the alleged charges was not motivated by a vindictive motive. We do not question the prosecutor's authority to bring the felony charges in the first instance, nor do we question the prosecutor's discretion in choosing which charges to bring against a particular defendant. But when, as here, there is a significant possibility that such discretion may have been exercised with a vindictive motive or purpose, the reason for the in-

We hold that the explanation offered by the state in the record and in its argument on appeal is inadequate to dispel the strong appearance of vindictiveness which led to the abandonment by Atchak of any attempt to challenge the validity of his original and superseding indictments.

■ There remains an issue as to the proper remedy in this case. Atchak, on the one hand, has urged that reversal of his convictions is necessary. The state, on the other hand, has argued that if Atchak prevails on the prosecutorial vindictiveness issue, the proper recourse should be to remand the case to the superior court for the purpose of allowing a challenge to the indictment to be brought.

The only arguable prejudice to Atchak in remanding this case for a challenge to the indictment without automatic reversal is the fear on his part that the superior court would tend to be unduly stringent in considering a challenge to his indictment because he already stands convicted and a finding of error would necessitate a new trial. While the fear of being disadvantaged by challenging an indictment after conviction is an understandable one, we do not believe that this factor, standing alone, warrants automatic reversal of Atchak's conviction.

■ We consider the possibility of actual prejudice to Atchak to be negligible. The Alaska Supreme Court has consistently held that courts should not hesitate to reverse a conviction when a substantial flaw in the underlying indictment is found, regardless of the strength of the evidence against the accused or the fairness of the trial leading to the conviction. *Keith v. State*, 612 P.2d 977, 980–81 (Alaska 1980); *Adams v. State*, 598 P.2d 503, 510 (Alaska 1979). We are confident that the superior court on remand will be capable of heeding this admonition in resolving any issues raised by Atchak with respect to the validity of his indictment. Accordingly, we believe that remand for a challenge to the indictment, rather than automatic reversal, is the better course to follow.

We therefore AFFIRM the conviction but remand this case to the superior court, with directions that Atchak be permitted to challenge the validity of the indictment upon which he stands convicted.[28]

---

crease in the gravity of the charges must be made to appear.

We do not intend by our opinion to impugn the actual motives of the [prosecution] in any way. But *Pearce* and *Blackledge* seek to reduce or eliminate apprehension on the part of an accused that he may be subjected to retaliatory or vindictive punishment by the prosecution only for attempting to exercise his procedural rights. Hence, the mere *appearance* of vindictiveness is enough to place the burden on the prosecution.

We note that previous cases have invoked the *Pearce/Blackledge* doctrine despite affirmative findings of a lack of malice or improper motivation on the part of the prosecution. *See, e.g., United States v. Groves*, 571 F.2d at 453; *United States v. Ruesga-Martinez*, 534 F.2d at 1369–70.

**28.** We do not believe that it is necessary to retain jurisdiction upon remand. In the event the superior court deems any challenge raised by Atchak to his indictment to be meritorious, the court should order the indictment to be dismissed and the conviction vacated. A ruling by the court adverse to Atchak shall be deemed a final judgment from which a separate appeal may be taken.