Donald Lee RAMSEY, Appellant,

v.

STATE of Alaska, Appellee.

No. 1227.

Court of Appeals of Alaska.

June 5, 1992.

R. Scott Taylor, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Kenneth M. Rosenstein, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

OPINION

BRYNER, Chief Judge.

Following a jury trial, Donald Lee Ramsey was convicted of two counts of attempted kidnapping, three counts of third-degree assault, and two counts of reckless endangerment. Superior Court Judge Mark C. Rowland sentenced Ramsey to consecutive terms totalling twenty-five years with ten years suspended. Ramsey appeals, contending that the trial court erred in denying his motion to dismiss for prosecutorial vindictiveness and in de-

* Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution.

clining his request to represent himself at trial. Ramsey also contends that his sentence is excessive. We affirm.

On January 2, 1985, Ramsey complained to the city of Anchorage about living conditions at his family's home in the Martin Arms Apartments. Dissatisfied with the initial response, Ramsey continued to complain and grew increasingly frustrated with the city bureaucracy. Ramsey eventually initiated a campaign to recall the mayor of Anchorage. Ramsey met with little success in pursuing this campaign over the next year and a half. He became convinced that he was the object of a widespread conspiracy to thwart his efforts. Ramsey believed that the conspiracy included numerous local officials and public figures, including members of Alaska's congressional delegation.

On August 14, 1986, Ramsey paid the Anchorage Times to print a full page advertisement critical of Senator Frank Murkowski. The newspaper printed the advertisement in its first edition on August 19, but then withdrew it from later editions, apparently because the editors found it to border on being libelous. Ramsey held Anchorage Times publisher Robert Atwood responsible for withdrawing the advertisement and believed that Atwood was among those conspiring against him.

On August 21, Ramsey's apartment caught fire and suffered extensive damage. Although the fire department determined that faulty wiring had caused the blaze, Ramsey became convinced that the fire was set purposely, in order to kill him. Ramsey blamed the fire on Atwood.

On the morning of October 21, 1986, Ramsey entered the Anchorage Times building in downtown Anchorage; he wore combat camouflage and carried a semi-automatic assault rifle, a .38 caliber handgun, approximately 150 rounds of extra ammunition, some smoke grenades, a knife, club, garrote, firecrackers, thumb cuffs, and food rations. Once inside, Ramsey chained and locked the front doors of the building. He then proceeded to the publishers' offices on the second floor. As he went upstairs, Ramsey threw a smoke grenade onto the ground floor in order to create a diversion. The grenade filled the newspaper offices with dense green smoke, making breathing difficult for Times employees who were in the area. The grenade landed next to some newspapers and started a fire, which burned along one of the interior walls of the building and spread to the ceiling before being doused.

When Ramsey reached the second floor, he demanded to know where Robert Atwood was. A nearby Times employee picked up a telephone and began to dial for help. Ramsey started screaming and firing his rifle into the ceiling. Still firing the rifle, Ramsey entered the office of Robert Atwood's daughter, Elaine Atwood. Elaine Atwood crouched behind her desk, and Robert Atwood soon entered the room from his adjoining office. Atwood approached Ramsey from behind and attempted to disarm him. Elaine stood up and joined in her father's efforts. Throughout the ensuing struggle over the rifle, Ramsey kept firing. Many of his shots narrowly missed the Atwoods, and some passed through the floor into the ground level office area of the building.

The Atwoods ultimately pulled the rifle away from Ramsey. Ramsey, however, immediately pulled out his pistol and cocked it, threatening to "blow [Atwood's] head off." The Atwoods rejoined their struggle with Ramsey. Other Times employees came to their assistance and managed to subdue Ramsey and hold him until the police arrived on the scene.

The state initially filed an indictment charging Ramsey with second-degree arson, attempted first-degree assault, third-degree assault, and reckless endangerment. At an arraignment hearing held on November 3, 1986, the court set Ramsey's case for trial beginning January 19, 1987. Approximately a week before the date set for trial, the district attorney's office reassigned the case to a different prosecutor. The new prosecutor reassessed the case and decided to obtain a superseding indictment, abandoning the arson charge and charging the more serious crimes of attempted kidnapping and attempted murder.

Ramsey's counsel contacted the new prosecutor on January 14, 1987, and told her Ramsey was contemplating a change of plea as to all charges other than arson; counsel indicated that he believed the evidence was insufficient to support the arson charge. In response, the prosecutor informed Ramsey's counsel that she had reviewed the case and was considering going back to the grand jury to seek another indictment. Later the same date, the prosecutor informed the court of her intent to reindict.

On January 20, 1987, the grand jury returned a superseding indictment charging Ramsey, in two alternative counts, with attempting to kidnap Robert Atwood, and, in two additional alternative counts, with attempting to kill Atwood. The indictment also charged Ramsey with three counts of third-degree assault (involving Elaine Atwood and two other Times employees), one count of criminally negligent burning, and two counts of reckless endangerment.

Ramsey moved to dismiss the second indictment, contending that it was barred by the doctrine against prosecutorial vindictiveness. The motion was assigned to Superior Court Judge S.J. Buckalew, Jr., who denied it.

Shortly before trial on the new charges, Ramsey sought to have his court-appointed counsel replaced, alleging irreconcilable differences over the management of the defense case. Counsel joined in the motion, revealing that Ramsey wanted him to subpoena as many as one hundred defense witnesses—many of whom were local officials and politicians—to testify in support of Ramsey's conspiracy theory. Ramsey's counsel told the court that he could not in good conscience accede to Ramsey's demands.

During the hearing concerning Ramsey's request for appointment of replacement counsel, it became apparent that no new attorney could be expected to step into the case without requiring an additional continuance of the trial date. Ramsey objected to any further postponement of trial and expressed the desire to waive counsel and represent himself instead. After conduct-

ing a formal inquiry, Judge Rowland denied Ramsey's request for self-representation, finding that Ramsey had not unequivocally waived his right to counsel and that, in any event, he would be incapable of presenting a coherent defense.

Following trial, Ramsey's jury acquitted him of attempted murder and criminally negligent burning, but convicted him of both counts of attempted kidnapping, and of the three counts of third-degree assault and two counts of reckless endangerment. Judge Rowland sentenced Ramsey to consecutive terms totalling twenty-five years with ten years suspended.

■ On appeal, Ramsey first contends that the superior court erred in denying his motion to dismiss the second indictment on grounds of prosecutorial vindictiveness. As a threshold matter, the state asserts that the prosecutorial vindictiveness doctrine is categorically inapplicable to Ramsey's case. The United States Supreme Court has specifically refused to extend the prosecutorial vindictiveness doctrine to the pre-trial phases of a criminal case. *See United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). Here, Ramsey's vindictiveness claim is based on actions taken by the state prior to his trial. Relying on *Goodwin*, the state claims that the prosecutorial vindictiveness doctrine is unavailable to Ramsey.

While this court has never squarely decided the issue, our decisions suggest that, under Alaska's constitutional guarantee of due process, the prosecutorial vindictiveness doctrine may apply once the state has filed an indictment, but not before. *Compare Morgan v. State*, 673 P.2d 897, 900 n. 2 (Alaska App.1983), *and Dyer v. State*, 666 P.2d 438 (Alaska App.1983), *with Atchak v. State*, 640 P.2d 135 (Alaska App. 1981). Resolution of the issue is unnecessary here, for we find that, even if claims of prosecutorial vindictiveness are not barred in all pretrial situations, Ramsey has failed to show vindictiveness in his case.

The prosecutorial vindictiveness doctrine does not apply to all situations in which the state increases the charge against a person

accused of a crime. In order to succeed, a claim of prosecutorial vindictiveness must, at a minimum, involve circumstances indicating that the state's decision to increase a defendant's charges was motivated by a desire to retaliate against the defendant for the exercise of some procedural right:

> Without [a] close temporal—or otherwise apparent—link between the exercise of the right and the 'penalty,' there can be no 'realistic likelihood of vindictiveness.'

*Atchak v. State*, 640 P.2d at 146 (quoting *United States v. Thurnhuber*, 572 F.2d 1307, 1310 (9th Cir.1977)).

Here, Ramsey has failed to make any credible showing that the state's decision to reindict was prompted by the exercise of any right on Ramsey's part. Instead, it appears that the state simply reevaluated its original charging decision and elected to seek more serious charges. Regardless of whether the state's action was arbitrary, or whether its delay in bringing the revised charges was excusable, the new charges did not amount to prosecutorial vindictiveness, because the state's decision to file them was unrelated to any action or inaction by Ramsey. Under the circumstances, we find no error in the trial court's denial of Ramsey's motion to dismiss the second indictment.

■ Ramsey next contends that the trial court erred in refusing to grant his request for self-representation. The trial court in this case made two separate findings. First, the court determined that Ramsey did not, in fact, waive the right to an attorney. Second, the court determined that Ramsey was not minimally capable of presenting a coherent case to the jury. We need address only the first finding, since we conclude that it is not clearly mistaken and supports the trial court's decision to deny self-representation.

■ Generally, a defendant has a right to self-representation. *Faretta v. California*, 422 U.S. 806, 821, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975); *McCracken v. State*, 518 P.2d 85, 91 (Alaska 1974). The right is not absolute, however; it attaches only when the defendant:

(1) having the competency to knowingly, intelligently, and voluntarily waive counsel, (2) does waive assistance of counsel, and (3) is at least minimally capable of presenting a coherent case to the jury. *Burks v. State*, 748 P.2d 1178, 1180 (Alaska App.1988). *See also Ortberg v. State*, 751 P.2d 1368, 1375 (Alaska App.1988).

■ Under the applicable standard, mental competency to waive counsel and the ability to present a coherent case are necessary prerequisites to self-representation. But they are not in themselves sufficient. Before allowing self-representation, the court must be satisfied that the defendant has actually entered into a valid waiver of the right to counsel—a waiver expressed, on the record, in terms that are voluntary, informed, and unconditional. *See Burks v. State*, 748 P.2d at 1180; *see also Adams v. State*, 829 P.2d 1201 (Alaska App.1992) (Bryner, C.J., concurring). In finding that Ramsey did not waive counsel, and indeed had no desire to do so, the trial court commented:

> [Ramsey] wishes to have counsel and to secure the advantages of such representation to himself. Mr. Ramsey's unhappy about his present counsel because his present counsel has refused to follow his direction with regard to both strategic and tactical decisions the defendant has made with regard to how his defense should be conducted. His dissatisfaction in this regard is the same as that he expressed about his previous counsel. . . . Mr. Ramsey by his complaint about counsel is attempting to manipulate the system into appointing counsel who will follow his directions in this regard. It is highly probable that Mr. Ramsey would have the same complaint about any counsel who was appointed to represent him because any counsel appointed would in all likelihood adopt a position consistent with [current counsel's]. The court would then be asked for a third time to replace that counsel as well.

These remarks find support in the record. When the court inquired of Ramsey's desire to proceed *pro se*, the following exchange occurred:

RAMSEY: ... I've never insinuated that I want to defend myself in a trial, but. . . .

THE COURT: You don't want to defend yourself in a . . .

RAMSEY: If I have to go to trial . . .

THE COURT: If you have to, you will, but you don't want to defend yourself, is that correct?

RAMSEY: Yes, sir, if I have to go to trial Tuesday, I'll defend myself. If I have to go to trial the 4th and—and there's no time for a public advocate to prepare for trial, I'll defend my—if I have to go to trial this afternoon, I'll defend myself because I want to go to trial. Sir, I've done nothing to stall the trial.

THE COURT: So what—so as I understand what you're telling me, Mr. Ramsey, is that you want to go to trial, you don't want to be delayed in trial, you want counsel, but you don't want this counsel, is that correct?

RAMSEY: Yes, sir. . . .

At another point in the hearing, the court asked Ramsey whether he thought he needed an attorney. Ramsey replied, "Oh, I know I need an attorney."

Ramsey's offer to waive counsel and proceed *pro se* thus arose as an integral part of his effort to have a new attorney appointed to replace his original counsel, with whom Ramsey claimed to have irreconcilable differences. Throughout the proceeding, Ramsey insisted that he would prefer to proceed with a new attorney and without any further delay. Indeed, Ramsey insisted that he needed an attorney. Ramsey made it clear that his waiver of counsel was prompted by the belief that his current counsel was incapable of providing competent representation and that his right to a new attorney would be conditioned on his willingness to agree to postpone his trial.

It seems evident that, far from offering a voluntary and unconditional waiver, Ramsey viewed himself as being forced to choose between what he perceived to be his right to a new attorney and his right to a trial without further delay. It is all but predictable that, if the trial court had ac-

cepted Ramsey's waiver of counsel, Ramsey could now, upon being convicted, claim that his decision to represent himself was involuntary—a decision coerced by the need to choose between two fundamental rights: his right to counsel and his right to a speedy trial.

We conclude that, under these circumstances, the trial court did not abuse its discretion in finding Ramsey had not actually offered a valid waiver of counsel, and in denying Ramsey's request for self-representation on that ground.

■ Ramsey lastly contends that the sentence he received—a total term of twenty-five years with ten years suspended—is excessive. Ramsey's sentence represents his conviction of one class A felony (the court merged Ramsey's convictions of alternative counts of attempted kidnapping into a single count), three class C felonies (third-degree assault), and two class A misdemeanors (reckless endangerment). In sentencing Ramsey, Judge Rowland imposed a sentence of fifteen years for the attempted kidnapping conviction. The judge imposed a term of four years for the third-degree assault conviction that involved Elaine Atwood and terms of two years for each of the two remaining third-degree assault convictions; the judge also imposed one-year terms for each of the two reckless endangerment convictions. Judge Rowland ordered all of the sentences to be served consecutively, for a total term of twenty-five years. The judge suspended ten years of the total term, on condition that Ramsey successfully complete five years of probation.

With regard to the attempted kidnapping, for which Ramsey was subject to a seven-year presumptive term, Judge Rowland found three aggravating factors: that Ramsey's conduct was among the most serious included in the definition of the offense, that his conduct resulted in physical injury to the victim, and that his conduct caused an imminent risk of injury to three or more persons. In finding the offense among the most serious in its class, Judge Rowland said:

[T]he duty of the Court becomes to construct a spectrum of possible ways in which the particular crime could be committed, and to determine where along that spectrum this particular offense and the commission of this particular offense lies. And considering the facts and circumstances of this case, I believe it is among the most serious included in the definition of attempted kidnapping. And in reaching that conclusion I rely upon the aura of terror and violence that surrounded it, the discharging of the firearm repeatedly, the danger to others that was created for whom the victims of the kidnappings felt not only professional kinship but I'm sure responsibility.

All of those factors I believe make this offense amongst the most serious of the conduct included in the definition of attempted kidnapping.

For similar reasons, Judge Rowland expressly found Ramsey's assault on Elaine Atwood to be an exceptionally serious case of third-degree assault; the judge also emphasized the extreme seriousness of Ramsey's overall conduct:

Mr. Ramsey has his whole life long found it difficult to cope with the rather ordinary circumstances that have been thrust upon him. On October 21st, 1986 he was, I believe, responding to an unreasonable belief that a monolithic and insensitive society over which and in which he felt he was powerless had operated to injure him and to deny him health and redress from any quarter. I think all of us probably have had some of these feelings from time to time.

On this occasion Mr. Ramsey was, I believe, in his own mind simply striking back. His conscious objective on October 21st, 1986 was to strike terror into the many innocent people who were there present, and particularly Robert Atwood who Mr. Ramsey had elected as his personal adversary and author and major part of all the personal tragedy in Mr. Ramsey's life. From his remarks here today I believe he apparently still holds Mr. Atwood responsible.

There is no reason at this time to go over the details of the offenses themselves. This was an outrageous and dangerous terrorist episode. The evidence presented at trial vividly described the circumstances surrounding the commission of these offenses, the danger to the many innocent people who were present, and particularly the Atwoods. I believe it has profoundly affected the lives of many of those who were there and were involved.

In deciding to impose a lengthy term of imprisonment, Judge Rowland gave careful consideration to Ramsey's character, and went on to discuss Ramsey's character and the seriousness of his conduct in light of the sentencing criteria articulated in *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970):

There are aspects of the defendant's character and personality which have to be noted. These conclusions I've drawn from the circumstances of the crime, the circumstances leading up to the crime, the general information about the defendant's background furnished to me in the presentence report, and my observations and contacts with the defendant, observations of and contacts with the defendant here in the courtroom.

First of all, the defendant is possessed of a remarkable and dangerous arrogance which allows him, when he so desires, to ignore any viewpoint but his own.

Secondly, he has an insensitivity to others, to anyone but himself, and an ability to depersonalize other people when his perceived needs so require.

Thirdly, he has a willingness to inflict injury upon others, terrorize them in order to secure his own ends, and to create justification for such action out of his own experience even when none logically or reasonably exist.

Fourthly, he has the emotional and intellectual capacity for the sustained planning and effort necessary to carry out the kind of criminal terrorist activity involved in this instance.

Fifthly, he has an unwillingness to recognize and confront the wrongfulness of

what he's done, and therefore demonstrates no remorse towards Robert Atwood. He continues to cling to the rationalizations for his conduct that he himself has fashioned out of whole cloth.

I've concluded that Mr. Ramsey is a dangerous offender, an extremely dangerous offender, likely to re-offend if not rehabilitated, and unlikely to be rehabilitated in the near future. Considering the *Chaney* criteria, I deem isolation for the protection of society to be the most important of the *Chaney* criteria to be served. Community condemnation, deterrence of others, and the offender himself, occupy an important but subordinate status. Rehabilitation can only begin when the defendant himself becomes willing to confront himself with what he's done, and he must essentially do that on his own. When and if he makes that important transition, certainly help will be available to him, and should be available to him, so that rehabilitation can be accomplished.

In the meantime, he should be in a structured setting for a very substantial period of time, and when released [be] monitored while on probation. A substantial period of time hanging over his

head as a deterrent in the event he refuses to conform his conduct to the requirements of his probation, and society, is also required.

The sentence Judge Rowland imposed is undeniably severe, particularly given Ramsey's status as a first offender. Nevertheless, it seems equally undeniable that Ramsey's offenses involved exceptionally dangerous conduct and that Ramsey's prospects for rehabilitation are unusually bleak. Having independently reviewed the entire sentencing record, we believe that Judge Rowland's thorough sentencing findings are supported by ample evidence and that his consideration of the applicable sentencing criteria is sound. We conclude that the sentence imposed below was not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

The judgment is AFFIRMED.